1999 UT 100

**Cecil NUNLEY, Plaintiff and Appellant,**

**v.**

**WESTATES CASING SERVICES, INC., a Utah corporation, Gene McFarland, and Betsi Magee, Defendants and Appellees.**

No. 980099.

Supreme Court of Utah.

Oct. 26, 1999.

---

Christine M. Petersen, Gordon Duvall, Pleasant Grove, for plaintiff.

Daniel S. Sam, Vernal, for defendants.

STEWART, Justice:

¶ 1 Cecil Nunley brought an action against Gene McFarland, Betsi Magee, and Westates Casing Services, Inc. (collectively "McFarland"), seeking enforcement of an agreement between these parties allowing Nunley an option to purchase 49% of Westates stock. Nunley appeals the trial court's ruling, following a non-jury trial, that (1) the parties

failed to reach an agreement providing Nunley an option to purchase stock in Westates; (2) even if the parties did create an option contract, it was void under the rule against perpetuities; and (3) conduct of the parties did not create an agreement under the legal theories of part performance or equitable estoppel. Nunley also appeals the trial court's rejection of his untimely motion to amend the court's findings and judgment pursuant to Utah Rule of Civil Procedure 52(b).

¶2 In 1987, Cecil Nunley and Gene McFarland created Westates Casing Services, Inc., a successful oil field business that supplied and installed oil and gas well casings. McFarland made a greater capital contribution to Westates than did Nunley and so owned a greater interest. However, all 3,500 shares of Westates stock were in Nunley's name. Nunley acknowledged that he held most of these shares in trust for McFarland. Nunley was also Westates' president and chairman of the board, which included only two other members, Pat McRae and Melinda Rollins.

### I. EARLY NEGOTIATIONS REGARDING COMPANY OWNERSHIP

¶3 In November 1989, Nunley and McFarland began negotiations to either (1) redistribute Westates shares in proportion to their initial capital contributions, or (2) create a means by which Nunley could repay McFarland for his disproportionate initial contribution of capital, thereby equalizing their ownership interests.

¶4 On December 8, 1989, Nunley's attorney, John Anderson, and McFarland's attorney, Bob McRae, met to discuss these issues. Afterward, Anderson wrote a memorandum for his file summarizing the meeting. The memorandum stated that the parties agreed Westates would eventually be equally owned by McFarland and Nunley. To compensate McFarland for his greater initial investment, the parties would form a new corporation called Qatar in which McFarland would own a 75% interest and Nunley a 25% interest.

Westates would transfer to Qatar most of its real property and equipment, and Qatar would then lease the real property and equipment back to Westates at fair rental value. McFarland would receive 75% of the profits accrued from these rentals to reimburse him for his greater initial capital contribution. Finally, the parties planned to execute a buy/sell agreement to ensure that if McFarland died Nunley could purchase 51% of the company's stock, and if Nunley retired or died McFarland would have a means to purchase Nunley's interest.

¶5 The proposed buy/sell agreement McRae later drafted stated that (1) McFarland would own 6,332 shares in Westates, or a 73% interest, while Nunley would own only 2,332 shares, or a 27% interest;[1] (2) McFarland would eventually own a 51% interest in Westates and Nunley would own only a 49% interest; (3) Nunley could purchase additional shares from McFarland at the rate of $20 per share in $1,000 increments until he owned the 49% interest; (4) if either McFarland or Nunley became insolvent or was deemed legally incompetent, the surviving party reserved the right to acquire the stock interest of the incapacitated party; and (5) Qatar, of whose shares McFarland would own 75% and Nunley 25%, would own the real property of Westates.

¶6 Anderson sent a reply dated January 11, 1990, to McRae stating:

Nunley can concede the fact that Gene McFarland, as long as he is active in the company, can have 51% of the stock and, therefore, its control.

There needs to be a vehicle, however, ... for Nunley to acquire the needed shares to own 51% of the company upon McFarland's death, retirement, or withdrawal from the corporation....

Finally, Nunley is not in a position, without a large raise from the company, to pay McFarland cash for the 1,900 some odd shares of stock. We thought the acquisition of the rental tools to be transferred to Qatar with the inordinate rentals accruing to McFarland would easily accomplish this.

---

**1.** Apparently, the increased number of shares that McFarland and Nunley held were intended to reflect subsequent capital contributions to Westates.

¶ 7 Anderson then sent a redraft of the proposed buy/sell agreement to McRae acknowledging that after Nunley purchased additional shares, McFarland was reimbursed for his initial larger investment:

McFarland will ... [then] own an approximate 51% interest in Westates and Nunley will own an approximate 49%.... It is also the express understanding between the parties to this agreement, that at McFarland's incapacitation, death or retirement, Nunley shall have the means to acquire the shares of stock necessary to insure that Nunley owns 51% of the company.

¶ 8 Over the next six months, the parties discussed the terms of the agreement. The terms had not been decided when McRae, in a letter dated August 7, 1990, demanded that Nunley pay the $1,300 he owed for his 25% interest in Qatar, that he sign over the 3,500 shares of Westates stock in his name, and that the 3,500 shares in Westates be reallocated between them to account for their disproportionate ownership interests. Anderson responded in a letter written August 15, 1990, by stating:

Nunley does acknowledge he owes $1,300 for stock in Qatar, which amount he will arrange to borrow and pay.

Mr. Nunley's position is and always has been that Gene McFarland may own fifty-one percent (51%) of Westates and Mr. Nunley will own forty-nine percent (49%) with an option for Mr. Nunley to acquire the other two percent (2%) upon Mr. McFarland's death or retirement.

Mr. Nunley also acknowledges that Mr. McFarland will have $70,000 coming as of the present date to accommodate the unequal initial investment in the company. As was suggested at our prior meetings, this can be accomplished in several vehicles for Mr. McFarland's and Mr. Nunley's benefit....

For example, the lease which has been proposed wherein Qatar appears as lessor and Westates Casing appears as lessee could be for a rental amount of $1200 per month with the $800 per month above current rental value going to the retirement of the Nunley debt.

## II. THE SPECIAL DIRECTORS MEETING

¶ 9 On August 31, 1990, the parties attended a special meeting of the Westates directors (the "Special Directors Meeting") to "[r]econcile stock ownership, ... [a]uthorize recognition of indebtedness due Gene McFarland for services rendered since date of commencing business on May 27, 1987[,] ... [and] [i]ssue stock certificates in accordance with the reconciliation of ownership." The only written records of the meeting are two sets of meeting minutes, an original which was prepared by McRae in September 1990 (the "McRae Minutes"), and an amended version prepared by Anderson in November 1990 (the "Anderson Minutes"). The McRae Minutes were signed by only two of the three board members, Melinda Rollins and Pat McRae. Only Nunley signed the Anderson Minutes.

¶ 10 The first section of the McRae Minutes describes the issues discussed at the Special Directors Meeting. The minutes state that the parties resolved the question of stock ownership. McFarland outlined his investment in Westates and what he felt was owed to him. Based on McFarland's contributions of approximately $63,300 and Nunley's contributions of approximately $22,700, the parties agreed that McFarland owned 73% of Westates, represented by 6,332 shares, and Nunley owned 27% of Westates, represented by 2,332 shares. The minutes also note that Pat McRae canceled the 3,500 share certificate in Nunley's name and issued 6,332 shares to Betsi Magee, McFarland's daughter and his designated stock holder, and 2,332 shares to Nunley. It also reports that Nunley and Anderson discussed Nunley's purchase from McFarland of additional shares sufficient to increase his ownership interest to 49%. McFarland also indicated that he wanted Nunley to purchase the shares owned by McFarland's heirs within 90 days of his death or retirement.

¶ 11 The second section of the McRae Minutes purports to list the items to which the parties agreed at the Special Directors Meeting as follows:

1. Stock certificate[s] would issue as set forth above.

2. Westates Casing, Inc., would sign a note owing to the McFarland Family in the sum of $58,500.00 [2] together with interest

. . . .

3. Cecil Nunley will have the right to purchase up to 49 percent of the outstanding stock at the price of $15.00 per share. There shall be no time limit set for the purchase of said stock.

4. Cecil and Gene will be entitled to receive the same amount of money as salary.

¶ 12 In response to the McRae Minutes, Anderson sent a letter on November 21, 1990, to Pat McRae, Westates' secretary and one of its board members, which stated, "I have amended the minutes in order to reflect Nunley's understanding of the underlying agreement. We would have no interest in continuing to do business with McFarland or to acquire 49 percent of the stock if, ultimately, Nunley could not acquire 51 percent of the company." The Anderson Minutes, signed only by Nunley, were attached. The minutes were identical to the McRae Minutes but added a sentence to the first section which stated, "Mr. Nunley also needed an option to buy 2 percent more common stock in order to give him control of the company upon death or retirement of McFarland at market prices." The Anderson Minutes also added a sentence to the second section which stated, "Cecil Nunley will have the right to acquire additional shares of stock upon death or retirement of Gene McFarland at market price as first option." At trial, Anderson testified that the terms agreed on in the Special Directors Meeting were to be memorialized not just in the meeting minutes, but also in a buy/sell agreement. The buy/sell agreement, however, was never written.

## III. COMMUNICATIONS BETWEEN THE PARTIES AFTER THE SPECIAL DIRECTORS MEETING

¶ 13 In response to the Anderson Minutes, McRae sent a letter to Anderson dated De-

cember 3, 1990, "to clear up the 2% ambiguity that [Nunley] is concerned about." The letter provided that Nunley could have an option to purchase an additional 2% of Westates stock upon McFarland's death or retirement, but only if Nunley also purchased all the remaining shares owned by McFarland's family within 60 days of purchasing the 2%.

Upon 60 days['] notice of intent to withdraw or retire or within 60 days of his death, whichever should occur first, Nunley will have bought 49% of the outstanding stock at $15.00 per share. At the latter of one of the above occurrences, Nunley can buy, within a 60 day period, or 60 days after death, the additional 2% required to make him a majority stockholder. . . . Thereafter Nunley will have 60 days to buy the remaining 49% of the McFarland Family interest at fair market value. . . .

In the event that Nunley fails to exercise his 2% purchase option, provided he has bought his 49% at $15.00 per share, his option to purchase control of the company expires at the end of the option period. Should he fail to exercise his duty to buy the 49% McFarland Family interest for cash at market value within the ensuing 60 days, the 2% control position is mutually rescinded and the McFarland Family reverts to its majority stock holder position.

¶ 14 On December 7, 1990, Anderson sent a response letter styled a "counter proposal," which increased the time during which Nunley must purchase the minority shares owned by the McFarland family to one year rather than 60 days. It also required that the McFarlands purchase Nunley's minority shares should Nunley retire or die before McFarland. The letter also required an increase in Nunley's salary to enable him to purchase additional stock:

[T]he matter can be resolved if the following modifications are agreed to:

---

**2.** Nunley testified that $54,600 of this amount was for 39 months of back salary that McFarland had not received at $1,400 per month. He also speculated that $1,400 was money owed McFar-

land for his contribution of an automobile and $1,250 was money owed McFarland for his contribution of a set of YT elevator keys.

1. Mr. Nunley needs to have at least one year to finance the payment to the minority stockholders.

2. The rights of Mr. Nunley would be reciprocal to Mr. McFarland, that is, upon Mr. Nunley's notice of intent to withdraw, retirement, or within 60 days of his death Mr. McFarland would be obligated to pay his heirs, or Mr. Nunley the appraised price for his stock upon the same terms.

3. Finally Mr. Nunley is to have a $15,-000 a year annual salary increase or bonus, with the understanding that after taxes are paid the net monies would be returned to the company for the purchase of stock.

If Mr. McFarland can live with this counter proposal, everyone, I think, can get along and continue to improve the company.

There is nothing in the record indicating that McRae or McFarland responded to this letter.

¶ 15 Nunley continued to serve another three and a half years as Westates' president and chairman of the board. In December 1993, Nunley signed his copy of the McRae Minutes but did not transmit a copy to anyone. In that same month, Nunley borrowed funds sufficient to purchase up to 49% of Westates stock from McFarland and attempted to do so; however, McFarland refused to sell any additional shares to Nunley. Shortly thereafter, Westates' board of directors reduced Nunley's salary by $500 per month, and McFarland replaced Nunley as company president. McFarland fired Nunley on the day Nunley filed a complaint to enforce his stock option.

## IV. OPTIONS TO PURCHASE STOCK

¶ 16 The first issue to be decided is whether, during the Special Directors Meeting, or thereafter, the parties entered an agreement providing Nunley either an option to purchase up to 49% of Westates stock or an option to purchase the 49% with an option to purchase an additional 2%.

¶ 17 The issue of whether a contract exists may present questions of both law and fact. Whether a contract has been formed is ultimately a conclusion of law, but that ordinarily depends on the resolution of subsidiary issues of fact. *See O'Hara v. Hall,* 628 P.2d 1289, 1290–91 (Utah 1981). We give no deference to the trial court's legal conclusions and review them for correctness. We give deference to the trial court's factual findings, however, and do not set them aside unless they are clearly erroneous. *See Reliance Ins. Co. v. Utah Dep't of Transp.,* 858 P.2d 1363, 1366 (Utah 1993). A trial court's finding of fact is not clearly erroneous unless it is against the clear weight of the evidence or we reach a definite and clear conclusion that a mistake has been made. *See State v. Irizarry,* 945 P.2d 676, 682 (Utah 1997).

¶ 18 Nunley argues that at the Special Directors Meeting the parties entered an oral agreement, later memorialized in the McRae and Anderson Minutes, allowing Nunley an option to purchase 49% of Westates shares with a second option to acquire an additional 2% of the shares upon the death or retirement of McFarland. He argues that the acceptance of, and consideration for, the agreement was his signing over the 3,500 shares in Westates that he held prior to the Special Directors Meeting.

¶ 19 McFarland agrees that at the Special Directors Meeting he extended an offer to Nunley but argues that the offer provided Nunley only the option to purchase up to 49% of Westates shares. He claims Nunley rejected this offer by insisting that McRae's Minutes be amended to include the option to purchase an additional 2% upon McFarland's death or his notice of retirement. McFarland concedes that through McRae's December 3rd letter he then extended a new offer to Nunley, allowing him the option to purchase both 49% of the shares and an additional 2%. He argues, however, that Nunley rejected this offer by submitting a counteroffer via Anderson's December 7th letter to McRae.

¶ 20 The trial court ruled that at the Special Directors Meeting, "the parties argued different issues ... [and] reached agreement as to some of the issues and did not reach agreement as to other issues." The court found that the parties were in agreement that Nunley owned a 27% interest in Westates and McFarland's family owned a 73%

**1084**

interest. The court also found that the parties discussed whether Nunley could purchase up to 49% of the company at a fixed price, as well as Nunley's desire to purchase an additional 2% upon McFarland's death or retirement to bring his total interest to 51% and that the 49% option and 2% option were interrelated in that Nunley demanded the option to purchase 2% of shares in Westates before he would agree to accept the option to purchase 49% of the shares.

¶ 21 In its conclusions of law, the court held that at the Special Directors Meeting McFarland offered Nunley an option contract to purchase up to 49% of shares in Westates at $15 per share but that the parties failed to reach agreement at the meeting on the critical issues of how, when, and on what terms Nunley could purchase enough stock to get from 49% to 51%. It also held that Nunley's insistence that the option to purchase up to 51% be included in the meeting minutes was a rejection of McFarland's offer for the option to purchase 49%. The court concluded that McRae's December 3, 1990, letter to Anderson constituted a "take-it-or-leave-it offer" from McFarland as to both the 49% and the 2% options and that Nunley rejected this offer as evidenced by Anderson's December 7, 1990, response letter. The court ruled that Anderson's letter constituted a rejection and counteroffer because it presented material alterations to the terms offered, thereby precluding formation of a contract. It then ruled that McFarland neither accepted the December 7th counteroffer nor renewed any prior offers following this rejection.

¶ 22 In determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on complete and definite terms. *See* 1 Joseph M. Perillo, *Corbin on Contracts* § 2.1, at 101 (rev. ed.1993). Based on the numerous expressions of the parties, both before and after the Special Directors Meeting, we conclude that the trial court correctly ruled that Nunley and McFarland did not enter an enforceable agreement entitling Nunley to purchase either up to 49% of Westates shares or the additional 2%. The parties did not agree regarding terms essential to the option to purchase 2% of Westates stock, and Nunley required the option to purchase 2% before he would accept the option to purchase 49% of Westates stock. "An agreement cannot be enforced if its terms are indefinite or demonstrate that there was no intent to contract." *Richard Barton Enters., Inc. v. Tsern,* 928 P.2d 368, 373 (Utah 1996) (citing *Valcarce v. Bitters,* 12 Utah 2d 61, 362 P.2d 427, 428 (1961); *Corbin on Contracts, supra,* § 4.3, at 569 (rev. ed.1993)).

¶ 23 The trial court found that while the parties discussed the option to purchase an additional 2% of Westates shares at the Special Directors Meeting, they could not agree "on the critical issue on how and when and on what terms" Nunley could purchase the additional 2%.[3] This finding is supported by substantial evidence. First, the separate minutes prepared by the parties indicate that they failed to agree on terms material to the 2% option contract at the Special Directors Meeting. The McRae Minutes completely omit any reference to an agreement allowing Nunley the option to purchase shares in addition to the 49%. While the Anderson Minutes do mention discussion at the meeting regarding "an option [for Nunley] to buy 2 percent more common stock," the minutes indicate that it was agreed only that "Nunley will have the right to acquire additional shares of stock upon the death or retirement of McFarland at market price as first option." Even the Anderson Minutes omit

3. The trial court ruled that during the meeting McFarland extended an offer to Nunley for an option contract entitling Nunley to purchase 49% of Westates shares, but Nunley rejected this offer. It is unclear from its ruling on what specific facts the trial court based its legal conclusion that McFarland extended an offer to Nunley. However, even were we to disagree that McFarland extended an offer that Nunley rejected and conclude instead that the parties' communication never amounted to more than preliminary negotiations, the result would be the same: As a matter of law, the parties failed to create a legally enforceable contract because they did not agree upon terms material to the contract. *See Richard Barton Enters.,* 928 P.2d at 373; *Corbin on Contracts, supra,* §§ 2.1, 2.2.

terms important to the 2% option, such as exactly how many "additional shares" the parties agreed Nunley could purchase and the time in which Nunley must exercise this option. Second, the communications between the parties after the Special Directors Meeting clearly indicate that both parties were engaged in continuing negotiations regarding material terms of the 2% option contract. The December 3, 1990, letter McRae sent to Anderson stated that Nunley could purchase the additional 2% of shares within 60 days of McFarland's death or notice of retirement but only if he had already acquired 49% of Westates shares by that time. It also stated that within 60 days of purchasing an additional 2% of the shares, Nunley must purchase the remaining 49% of shares owned by the McFarland family. If Nunley failed to buy out these minority shareholders, the sale of the 2% of shares would be rescinded and the McFarlands would again become Westates' majority stockholders. Anderson responded by a letter dated December 7, 1990, which stated that Nunley required one year to purchase the minority interest of McFarland's family, rather than 60 days. Nunley also demanded a $15,000 annual raise to finance his purchase of shares from Westates. In addition, Nunley insisted that should he retire or die before McFarland, McFarland would be obligated to buy all the shares held in Nunley's name within 60 days of his death or notice of retirement. Finally, although Anderson's December 7th letter to McRae expressly indicated that McFarland must assent to Nunley's terms, Nunley has provided no evidence that McFarland ever did assent. In fact, the evidence indicates that the parties' negotiations simply broke down before agreement could be reached.

¶ 24 After finding that the parties failed to agree on terms material to the option to purchase 2% of Westates shares, the court held that the parties also failed to agree regarding the option to purchase 49% of Westates shares, because Nunley refused to accept an option to purchase 49% without an option to purchase the 2%, which would enable him to acquire controlling interest in Westates after McFarland's death or retirement. The trial court found that the parties

did agree on terms related to Nunley's option to purchase up to 49% of Westates stock. It also found, however, that the parties failed to create an enforceable agreement as to either this option or the option to purchase 2% because the two options were "interrelated in that an agreement as to the 51% issue was required in order to have an agreement as to the 49% issue." These findings are supported by substantial evidence. Both McRae's and Anderson's meeting minutes confirm that the parties agreed, at least in principle, that Nunley had the right to purchase up to 49% of Westates shares. All the correspondence between the parties leading up to the meeting indicate that Nunley would initially be satisfied owning either 49% or 50% of Westates shares. However, it is also clear that Nunley always desired to have the right to acquire the controlling interest in Westates upon McFarland's death or retirement.

¶ 25 In a letter Anderson sent McRae on January 11, 1990, seven months before the Special Directors Meeting, Anderson stated, "There needs to be a vehicle ... for Nunley to acquire the needed shares to own 51% of the company upon McFarland's death, retirement, or withdrawal from the corporation." Anderson also included this term in a buy/sell agreement he drafted for Nunley around the same time. Just prior to the Special Directors Meeting, Anderson again reiterated Nunley's expectation that he acquire controlling interest in Westates upon McFarland's death or retirement in a letter he sent to McRae on August 15, 1990. After the Special Director's Meeting, Anderson redrafted the McRae Minutes because they omitted any reference to Nunley's eventual acquisition of a controlling interest in Westates. Even more indicative of Nunley's insistence that he receive both the option to purchase up to 49% of Westates stock and the additional 2% is Anderson's statement in the December 7, 1990, letter that Nunley "would have no interest in continuing to do business with McFarland or to acquire 49 percent of the stock, if ultimately Nunley could not acquire 51 percent of the company." Finally, Nunley testified at trial that it was his understanding from the beginning of

the partnership that he would eventually own controlling interest in Westates. In fact, when asked whether the option to purchase 2% of Westates shares was important, Nunley responded "Yes." When then asked whether the 2% option was "a provision that could make or break the whole deal," Nunley responded "Yes ... absolutely." In light of the evidence, the trial court correctly ruled that an agreement could not be made between the parties as to the 49% without an agreement as to the 2%. *See Corbin on Contracts, supra* § 2.1, at 101. Therefore, the parties failed to create an enforceable agreement allowing Nunley an option to purchase 49% of Westates shares because the parties ultimately failed to agree on terms material to the option to purchase an additional 2% of Westates.

¶ 26 The trial court also correctly concluded that the parties failed to create an enforceable agreement allowing Nunley an option to purchase either 49% of Westates stock or an additional 2% following the Special Directors Meeting. The court ruled that the December 3rd letter that McRae sent to Anderson constituted a "take-it-or-leave-it offer" as to both the option to purchase the 49% and the option to purchase the 2%. We agree. An offer is a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it.' " *Engineering Assoc. v. Irving Place Assoc.*, 622 P.2d 784, 787 (Utah 1980) (quoting Restatement (Second) of Contracts § 24). The stated purpose of McRae's December 3rd letter to Anderson was to present to Nunley a "take-it-or-leave-it offer" in which McRae set forth the specific terms "McFarland can live with." The letter provided that Nunley, having acquired 49% of Westates stock at $15 per share, would have 60 days after McFarland's death or notice of retirement in which to purchase an additional 2% at fair market value, to be determined by independent appraisers. The letter required that after Nunley purchased the additional 2% of Westates shares, Nunley "buy the remaining 49% of the McFarland Family interest at fair market value" within 60 days thereafter. If Nunley failed to "exercise his duty to buy the 49% McFarland Family in-

terest ... within the ensuing 60 days, the 2% control position is mutually rescinded, and the McFarland Family reverts to its majority stockholder position." The letter presented a non-negotiable offer subject only to Nunley's assent to the specific terms offered; McRae stated in the letter that "McFarland has no interest in debating or arguing about what is fair to Nunley in addition to what has been afforded him. This is a take it or leave it offer which expires at 5:00 p.m. on December 14, 1990."

¶ 27 The trial court correctly ruled that the letter constituted an offer because it stated McFarland's willingness to enter into a bargain with Nunley on specific terms. The trial court also correctly ruled that Anderson's December 7th response to McRae's December 3rd offer constituted a counteroffer because it "requested alterations to [the December 3rd offer] which were material to the formation of a contract." "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995). The December 7th letter from Anderson proposed three material changes to McFarland's December 3rd offer. First, Nunley insisted on a period of "at least one year to finance the payment to the minority stockholders" rather than the 60 days allowed in McFarland's offer. Second, Nunley insisted that if he should die or retire before McFarland, McFarland would be obligated to pay Nunley or his heirs the appraised price for his minority shares within 60 days of his notice of retirement or upon his death. Finally, Nunley insisted on a salary increase of $15,000 each year to enable him to purchase Westates stock from McFarland. Clearly, Nunley did not agree to the terms set forth in McFarland's December 3rd offer, such as the consideration and time of performance. Anderson even styled the December 7th letter a "counter proposal," stating that "the matter can be resolved [only] if the following modifications are agreed to .... If Mr. McFarland can live with this counter proposal, everyone, I think, can get along and continue to improve the

company." Nunley did not unconditionally accept the terms presented in McFarland's offer; he demanded that they be modified and thereby rejected the offer.

¶ 28 Finally, the trial court ruled that no evidence before the court suggested that McFarland ever accepted Nunley's counter-offer, extended a new offer to Nunley, or revived any prior offer. Therefore, Nunley and McFarland never agreed to provide Nunley the option to purchase 49% of the shares of Westates or to obtain a controlling interest upon the death or retirement of McFarland.

## V. EQUITABLE ESTOPPEL

¶ 29 The next issue is whether the trial court was correct in ruling that the parties' conduct did not create an agreement under the legal theories of part performance and equitable estoppel. Nunley argues that McFarland should be estopped from asserting that the parties failed to create an enforceable agreement which provided Nunley the option to purchase additional Westates stock because the parties implemented all other terms on which they agreed during the Special Directors Meeting. According to Nunley, at the Special Directors Meeting the parties entered an agreement that included four terms: (1) the parties would reallocate Westates stock, providing Nunley 2,332 shares and the McFarland family 6,332 shares; (2) Westates would execute a promissory note in favor of the McFarland family for $58,500; (3) Nunley would have the option to purchase additional Westates stock from the McFarland family; and (4) Nunley and McFarland would thereafter receive the same salary. Nunley claims that in consideration for this agreement, he returned his certificate for 3,500 shares of Westates stock, representing all outstanding shares of the company prior to the reallocation.

¶ 30 According to Nunley, the parties fully implemented the first, second, and fourth terms, as agreed at the meeting. Nunley argues that because the parties fully per-formed all other terms of the agreement, he reasonably believed, to his detriment, that McFarland would honor his option to purchase additional shares. Nunley claims he suffered detriment when he returned the certificate of 3,500 Westates shares and incurred significant debt in order to purchase stock from McFarland. According to Nunley, the doctrines of equitable estoppel and part performance therefore preclude McFarland from now claiming that the parties failed to create an agreement which entitled Nunley to purchase Westates shares from the McFarland family.[4]

¶ 31 Implicit in Nunley's argument is the assertion that during the Special Directors Meeting McFarland promised or otherwise represented that he would sell additional shares to Nunley. McFarland admits that he was willing to allow Nunley the stock option for purchase of up to 49% of Westates stock and that he in fact offered Nunley this option at the meeting; however, McFarland argues that Nunley ultimately rejected this offer, precluding the formation of an enforceable agreement as to this term. Application of particular facts to the legal standard of estoppel is a mixed question of law and fact. We review the trial court's legal conclusion for correctness and its factual findings for clear error. See State v. Irizarry, 945 P.2d 676, 681–82 (Utah 1997); Angelos v. First Interstate Bank of Utah, 671 P.2d 772, 776 (Utah 1983). On the issue of estoppel, however, we generally grant the trial court broad discretion. See Irizarry, 945 P.2d at 682.

¶ 32 With respect to Nunley's equitable estoppel and part performance arguments, the trial court concluded, "An agreement should not be implied from the conduct of the parties or under the legal theories of part performance and estoppel." Several of the court's findings of fact support this conclusion. The court found that prior to the Special Directors Meeting, the parties had not determined their respective ownership interests but that Nunley was obligated to recognize McFarland's majority interest;

---

**4.** Nunley does not assert that part performance is an independent basis for concluding the parties entered an agreement providing Nunley the option to purchase additional shares. Therefore, we assume that he alleges part performance of the agreement only as support for his equitable estoppel claim.

that at the meeting, the parties properly determined that Nunley owned a 27% interest and that McFarland's family owned a 73% interest in Westates; and that among all issues discussed at the meeting, the parties reached agreement as to some but failed to reach agreement as to others.

¶ 33 Specifically, the court found that the parties discussed both Nunley's desire to purchase up to 49% of Westates stock, as well as his desire to purchase an additional 2% thereafter. However, the court found that the parties failed to reach agreement as to either option, because Nunley rejected McFarland's offer for an option to purchase up to 49% of Westates without a second option to purchase an additional 2%. The court found that the parties failed to come to terms at the meeting "on the critical issue on how and when and on what terms" Nunley could purchase the additional 2%. From these facts and the finding that negotiations ultimately broke down prior to the formation of a contract, the court concluded that the parties never reached agreement as to either option. Contrary to Nunley's assertion, the court did not find that the proffered first, second, and fourth terms of the agreement were legally enforceable. Nunley has failed to show that the trial court's findings of fact in this regard are clearly erroneous.

■■■ ¶ 34 We hold that the trial court correctly concluded an agreement between Nunley and McFarland cannot be implied under the theory of estoppel because Nunley has failed to prove the existence of elements essential to that claim. Equitable estoppel requires proof of three elements:

> (i) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (ii) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act, or failure to act; and (iii) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*CECO Corp. v. Concrete Specialists, Inc.*, 772 P.2d 967, 969–70 (Utah 1989) (citations omitted). As a general rule, absent circumstances where application of promissory es-

toppel is appropriate, "a representation or assurance, in order to furnish the basis of an estoppel, must relate to some present or past fact or state of things, as distinguished from mere promises or statements as to the future." 28 Am.Jur.2d *Estoppel and Waiver* § 46 (footnotes omitted); *see also Ravarino v. Price,* 123 Utah 559, 567–70, 260 P.2d 570, 575–77 (1953) (noting that promissory estoppel is an exception to the "general rule that a mere promise as to future conduct will not work an estoppel"). Nunley's claim is more appropriately analyzed under the doctrine of promissory estoppel, because his argument necessarily depends on the assertion that McFarland promised or at least represented that he would sell additional Westates stock to Nunley in the future. *See Ravarino,* 123 Utah at 570, 260 P.2d at 574–78.

¶ 35 Promissory estoppel is defined in Restatement (Second) of Contracts § 90. This Court adopted section 90 in *Tolboe Construction v. Staker Paving & Construction,* 682 P.2d 843, 845–46 (Utah 1984). This section states in pertinent part:

> A promise made which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

We have held that the elements of promissory estoppel in Utah are:

> (1) [T]he plaintiff acted with prudence and in reasonable reliance on a promise made by the defendant; (2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; (3) the defendant was aware of all material facts; and (4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff.

*Skanchy v. Calcados Ortope SA,* 952 P.2d 1071, 1077 (Utah 1998) (citing *Tolboe Constr.,* 682 P.2d at 845–46; *Andreason v. Aetna Cas. & Sur. Co.,* 848 P.2d 171 (Utah Ct. App. 1993)).

¶ 36 Nunley's estoppel argument fails because he has provided no evidence proving that McFarland promised to sell Nunley additional Westates stock or that Nunley acted prudently or in reasonable reliance on McFarland's alleged promise. Nunley has shown this Court no evidence that McFarland made any specific statements during the Special Directors Meeting that can be construed as a promise to sell additional stock to Nunley. A party claiming estoppel must present evidence showing that an offer or promise was made on which the party based his or her reliance. *See Skanchy*, 952 P.2d at 1077; *Tolboe Constr.*, 682 P.2d at 845–46; Restatement (Second) of Contracts § 90 (1979); 28 Am.Jur.2d *Estoppel and Waiver* § 48. Likewise, the alleged promise must be reasonably certain and definite, and a claimant's subjective understanding of the promissor's statements cannot, without more, support a promissory estoppel claim. *See, e.g., Rose v. Allied Dev. Co.*, 719 P.2d 83, 87 (Utah 1986); 28 Am.Jur.2d *Estoppel and Waiver* § 48.

¶ 37 Nunley argues that the meeting minutes prove the parties agreed that Nunley could purchase up to 49% of Westates stock. Both the McRae and Anderson Minutes state: "[I]t was agreed ... Cecil Nunley will have the right to purchase up to 49 percent of the outstanding stock at the price of $15.00 per share." In addition, the letter sent by Anderson, Nunley's attorney, to Westates' secretary following the meeting indicates Nunley and Anderson believed the parties left the meeting having agreed that Nunley would have both an option to purchase up to 49% of Westates stock as well as an option to purchase an additional 2% thereafter. Nunley also testified that both parties always intended Nunley would acquire controlling interest of Westates after McFarland's death or retirement. Finally, when asked at trial whether Nunley had a right to purchase up to 51% of Westates stock, McFarland responded, "Subject to a contract which was verbal."

¶ 38 This evidence does not clearly show that at the Special Directors Meeting McFarland made a promise to Nunley that was reasonably certain and definite and that afforded him an option to purchase additional Westates shares. The trial court found that, while the parties did discuss both Nunley's interest in acquiring an option to purchase up to 49% of Westates shares, as well as his desire to obtain an option to purchase 2% more of Westates shares on McFarland's death or retirement, McFarland offered Nunley only an option to purchase 49% of Westates stock, which Nunley subsequently rejected. As discussed above, this finding is supported by substantial evidence. *See* ¶¶ 20–23. At most, by offering Nunley an option to purchase up to 49% of Westates stock, McFarland expressed his willingness to enter a contract. It is clear that communication between the parties during the meeting amounted to no more than preliminary negotiations.

¶ 39 Even if McFarland did promise to sell Nunley additional Westates stock, it cannot be said that Nunley's reliance on such a promise was reasonable. Nunley claims that because the company continued to operate under all of the other terms of the agreement entered at the Special Directors Meeting, he reasonably believed that McFarland would honor the balance of the agreement related to Nunley's stock option. He claims he suffered detriment when he surrendered the certificate for 3,500 shares of Westates stock and when he incurred substantial debt in order to purchase the stock from McFarland.

¶ 40 Nunley's surrender of the certificate for 3,500 shares of Westates stock did not constitute detrimental reliance by Nunley because Nunley held the majority of these shares in trust for McFarland due to McFarland's greater capital contributions. The trial court found that, because of unequal capital contributions to Westates, Nunley was obligated to recognize McFarland's majority interest in Westates even before the Special Directors Meeting. It found that at the meeting the parties correctly determined that Nunley owned only a 27% interest in Westates, represented by 2,332 Westates shares, and that McFarland owned a 73% interest in Westates, represented by 6,332 Westates shares. These findings are supported by substantial evidence. *See* ¶¶ 4–5. Nunley acknowledged that the majority of

the 3,500 Westates shares he held in his name prior to the Special Directors Meeting were held in trust for McFarland because of McFarland's greater initial capital contributions to Westates. Nunley also testified that at the Special Directors Meeting he agreed that the 2,332/6,332 split in outstanding Westates shares was the proper distribution of shares between the parties based on their contributions to the company. In light of these facts, the evidence simply does not support Nunley's claim that he surrendered the certificate for 3,500 Westates shares in reliance on McFarland's promise to sell him additional shares in the company because he was already obliged to surrender the certificate. By surrendering the certificate, Nunley merely made possible a redistribution of Westates stock which accurately reflected relative ownership of the company between the parties.

¶ 41 Although Nunley may have suffered a detriment when he borrowed money at high interest rates to purchase additional shares of Westates stock from McFarland, reliance on a promise by McFarland to sell him these shares was not reasonable. Based on communication between Nunley and McFarland and their respective attorneys, it should have been clear to Nunley that the parties could not agree on terms essential to the option contract and that Nunley had no basis for assuming McFarland would thereafter honor his alleged promise to sell additional shares to Nunley. There is ample evidence to support the district court's finding that at the Special Directors Meeting, the parties failed to come to terms on how, when, and on what terms Nunley could purchase the additional 2% of Westates shares, and that without agreement as to the option to purchase an additional 2% to give him a majority interest, Nunley had no interest in purchasing up to 49% of Westates shares. The McRae Minutes omitted any reference to Nunley's option to purchase an additional

2% of Westates shares. Nunley clearly indicated to McFarland after the meeting that he "would have no interest in continuing to do business with McFarland or to acquire 49 percent of the stock, if ultimately Nunley could not acquire 51 percent of the company." Finally, McFarland did not respond to Nunley's December 7th counteroffer. At the very least, McFarland's failure to respond should have indicated to Nunley that the parties utterly failed to reach agreement with respect to either the option to purchase up to 49% of Westates shares or the option to purchase an additional 2%. However, in spite of McFarland's silence, Nunley proceeded to obtain financing to purchase more shares. Even assuming that McFarland promised to sell additional shares to Nunley and that Nunley detrimentally relied on this promise when he incurred substantial debt to purchase these shares, Nunley did not act prudently and his reliance was not reasonable. Nunley's promissory estoppel argument therefore fails.[5]

## VI. RULE 52(b)

¶ 42 The last issue presented is whether the trial court erred in denying Nunley's untimely Rule 52(b) motion to amend the court's findings and judgment. The trial court filed its findings, conclusions, and judgment on July 25, 1997. Nunley moved to amend the findings of fact and judgment under Rule 52(b) on September 22, 1997, along with a motion for leave to file an untimely motion to amend (the "motion to extend"). The court rejected these motions as untimely. The trial court's interpretation of the rules of civil procedure presents a question of law which we review for correctness. *See Keller v. Southwood North Medical Pavilion,* 959 P.2d 102, 105 (Utah 1998).

¶ 43 Rule 52(b) states in relevant part: "Upon motion of a party made not later than 10 days after entry of judgment, the court may amend its findings or make additional

---

5. Nunley also argues that the trial court erred when it "fail[ed] to do equity" by refusing to return to Nunley the 3,500 shares he claims he surrendered in consideration for the agreement. Nunley's argument on this point is not tenable because, as the trial court correctly concluded, surrendering the certificate could not constitute consideration for the agreement. Nunley admittedly held most of those 3,500 shares in trust for McFarland, and the parties ultimately reallocated company shares at the Special Directors Meeting in proportion to their individual capital contributions to Westates. *See* ¶¶ 4–9.

findings and may amend the judgment accordingly." Rule 6(b) includes a general provision permitting the enlargement of filing deadlines included in the rules. However, a court may not extend the time for taking action under Rule 52(b) "except to the extent and under the conditions stated in" it. Utah R. Civ. P. 6(b). Rule 52(b) provides no circumstance or condition under which a motion to amend may be filed after expiration of the 10–day period.

¶ 44 With respect to Nunley's motion for leave to file an untimely motion to amend, the court stated it was "forced to conclude that the court cannot extend the 10–day time limit for filing a motion to amend findings once it has expired," in light of Rule 6(b)'s limitation on a court's prerogative to extend the time for filing Rule 52(b) motions. Nevertheless, the court went on to consider Nunley's motion to amend, "in the event the ruling on the Motion to Extend is wrong." After reviewing Nunley's arguments and objections, the court held that its findings, conclusions, and judgment "are faithful to the court's ruling and reasoning" and concluded that the motion to amend, "if it must be considered, is denied."

¶ 45 Nunley appeals the trial court's denial of his motion to extend under Rule 52(b). He argues that Rule 1 of the Utah Rules of Civil Procedure requires that all of the Utah Rules of Civil Procedure "be liberally construed to secure the just, speedy, and inexpensive determination of every action." Utah R. Civ. P. 1. Nunley also argues that motions to extend untimely filings based on excusable neglect should be granted. He claims his attorney's failure to file the motion on time is excusable because his attorney was on vacation for the entire 10–day period following the trial court's entry of judgment. Also, the court's tape recorder was broken, and Nunley was unable to obtain and review a recorded copy of the transcript.

¶ 46 We conclude that the trial court did not err in denying Nunley's motion to extend. Rule 6(b) prohibits courts from extending the filing deadline under Rule 52(b) "except to the extent and under the conditions stated in" Rule 52(b). Utah R. Civ. P. 6(b). Rule 52(b) allows courts to amend their findings only if the party brings a motion no later than ten days after the trial court's entry of judgment; the rule does not provide for any extensions. See Utah R. Civ. P. 52(b). Nunley filed his motion to amend under Rule 52(b) more than 10 days after the July 25, 1997, entry of judgment. Therefore, under both Rule 6(b) and Rule 52(b), the court could not grant Nunley's motion to extend despite the fact that Nunley's counsel was out of town when the judgment was filed and the fact that Nunley could not get a copy of the recorded transcript because the court's tape recorder was broken. See Lord v. Lord, 709 P.2d 338, 338 (Utah 1985); Holbrook v. Hodson, 24 Utah 2d 120, 122, 466 P.2d 843, 844 (1970); Nunley v. Stan Katz Real Estate, Inc., 15 Utah 2d 126, 127–28, 388 P.2d 798, 799 (1964); In re Bundy's Estate, 121 Utah 299, 309–10, 241 P.2d 462, 467 (1952).

¶ 47 Affirmed.

¶ 48 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Justice STEWART's opinion.

