2018 UT App 115

# THE UTAH COURT OF APPEALS

PHILLIP GRIMM,
Appellee and Cross-Appellant,

*v.*

DxNA LLC,
Appellant and Cross-Appellee.

Opinion
No. 20160455-CA
Filed June 14, 2018

Fifth District Court, St. George Department
The Honorable Pamela G. Heffernan
No. 110502762

Bryan J. Pattison and Elijah L. Milne, Attorneys for
Appellant and Cross-Appellee

Andrew W. Stavros, Attorney for Appellee
and Cross-Appellant

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and DAVID N. MORTENSEN
concurred.

ORME, Judge:

¶1      Appellant DxNA LLC appeals the trial court's judgment that it had an enforceable employment agreement with Appellee Phillip Grimm. DxNA also appeals the trial court's calculation of prejudgment interest. Grimm cross-appeals, arguing that the trial court erred in ruling that he did not make a written demand and in therefore declining to award him a statutory penalty or attorney fees for DxNA's failure to pay his wages. We affirm.

BACKGROUND

¶2    Grimm was initially hired in 2007 to be the chief executive officer (CEO) for DxNA Nucleic Analytics (Nucleic), located in St. George, Utah.[1] His two-year employment agreement included a yearly salary of $250,000, an equity membership of 5%, and reimbursement for business expenses. It also required that Grimm's principal place of employment be St. George, Utah, with the opportunity to work one week per month elsewhere.

¶3    Less than a year later, Nucleic was in need of funding and sought out Glory BioVentures LLC (Glory), an investment firm. This resulted in Nucleic being restructured as DxNA LLC (DxNA), with Glory as its majority owner. As a result of the restructuring, Grimm was required to resign and be rehired by DxNA, and for that reason, Grimm resigned with the expectation that he would sign a new employment agreement with DxNA. Following his resignation, he continued to work and receive his salary and all of the compensation and benefits provided for under the original agreement.

*Negotiations with Glory*

¶4    Negotiations for Grimm's new employment agreement began in July 2008. Several drafts of an agreement were exchanged between Grimm and Glory, but the parties remained at an impasse over three issues: whether Grimm's principal place of employment would be in St. George or split between St. George and Salt Lake City; whether severance pay for termination without cause would be 15 weeks or 26 weeks; and

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Lake Philgas Service v. Valley Bank & Trust Co.*, 845 P.2d 951, 953 n.1 (Utah Ct. App. 1993).

whether notice for non-renewal of Grimm's employment agreement would be 90 days or 120 days.[2]

¶5     Glory sent Grimm a draft in February 2009 (the Final Proposal), stipulating that he would receive 15 weeks of severance pay, that his principal place of employment would be divided between St. George and Salt Lake City,[3] and that the notice of non-renewal would be 90 days. Grimm opposed two of these provisions in a June 2009 email, proposing instead that his principal place of business be in Salt Lake City, with travel as required to St. George, and that, if he was terminated without cause, his severance pay would be increased to 26 weeks.

¶6     A few weeks after Glory received Grimm's proposed revisions, Grimm attended a DxNA board meeting at Glory's office and met with one of its principal investors to discuss the agreement. Grimm testified that an employment agreement was signed (the Missing Agreement), resolving the disputed issues in his favor. He said that Glory retained the Missing Agreement and that he never received a copy. Glory refuted this, claiming that no agreement was signed and that the disputed issues were never resolved. But consistent with Grimm's basic version of events, there were no further discussions regarding an employment agreement after the meeting. Grimm continued to reside in Salt Lake City and commute to St. George, received a

---

2. The parties agreed that Grimm would receive a salary of $250,000 per year, 20 paid vacation days per year, and a 1% membership interest in DxNA on each of the first, second, and third anniversaries of the date of the agreement.

3. The Final Proposal stated that Grimm's principal place of employment would be allocated between "St. George, Utah and St. George, Utah." But an email between Glory and Grimm clarified that the provision was intended to read "Salt Lake City and Saint George."

salary of $250,000, and obtained reimbursement for travel and business expenses.

*Grimm's Termination*

¶7     Relations between Glory and Grimm soured in 2010, when Glory became dissatisfied with Grimm's performance as CEO and threatened to fire him. However, DxNA was once again experiencing serious financial difficulties, and in July 2010, Glory divested itself of any ownership in DxNA by assigning all its rights and interests over to DxNA in exchange for a promissory note. After Glory's departure as an owner, Grimm received an email in January 2011 from DxNA's board of directors indicating that it intended to completely reorganize DxNA and would require the resignation of all employees. Shortly thereafter, Grimm was terminated by the board. As the board understood it, no employment agreement existed, and Grimm was an at-will employee who could be fired without cause.

¶8     Two days after his termination, Grimm emailed a member of the board (the Email) regarding the amounts that DxNA owed him for unpaid salary, accrued paid time off (PTO), business expenses, and severance pay. Because of DxNA's financial difficulties, Grimm indicated in the Email that he would be willing to work with DxNA in finding other means to pay him what he was owed. DxNA did not pay Grimm anything, and he eventually filed suit.

*Trial Court's Findings and Judgment*

¶9     Grimm's complaint contended that DxNA breached the Missing Agreement and that he was entitled to his unpaid salary, unreimbursed business expenses, accrued PTO, and 26 weeks of severance pay. He also sought a statutory penalty, as provided by Utah Code section 34-28-5, for DxNA's failure to pay his wages within 24 hours of receiving the Email, and attorney fees under Utah Code section 34-27-1.

¶10    A four-day bench trial ensued, with the central issue being whether there was an enforceable agreement between Grimm and DxNA. Concluding that there was an enforceable agreement, the trial court reasoned that Glory and Grimm "were on the cusp of finalizing their agreement as evidenced by . . . emails in early June, 2009" and that "[i]t simply makes no sense that the issue would have fallen off the edge of a cliff and disappeared." Therefore, largely crediting Grimm's testimony, the court determined that the course of negotiations, coupled with Grimm's continued employment thereafter, were evidence that an agreement had been reached and that the Final Proposal was "the best representation of the final agreement between the parties" in the absence of a copy of the agreement.

¶11    On the three issues in dispute, the court determined that there was mutual assent among the parties that the principal place of employment for Grimm was to be split between St. George and Salt Lake City, that Grimm would receive 15 weeks of severance pay if fired without cause, and that there would be 90 days advance notice for non-renewal of Grimm's employment agreement. As to damages, the court concluded that Grimm was entitled to full reimbursement of his business expenses, his unpaid salary, 12 days of PTO, a 2% membership interest in DxNA, and 15 weeks of severance pay. Grimm was awarded prejudgment interest at a rate of 10%. *See* Utah Code Ann. § 15-1-1(2) (LexisNexis 2013) (providing that a rate of 10% per annum applies to loans or the "forbearance of any money, goods, or chose in action"). But the court concluded that Grimm was not entitled to the statutory penalty or attorney fees for DxNA's failure to pay his wages within 24 hours of the Email because Grimm did not demand immediate payment. DxNA appeals and Grimm cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶12    DxNA advances a number of arguments in support of its contention that there was a lack of mutual assent to the material terms of the Final Proposal. "Whether the parties had a meeting

of the minds sufficient to create a binding contract is . . . an issue of fact." *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 13, 221 P.3d 867 (omission in original) (citation and internal quotation marks omitted). We review findings of fact for clear error, "reversing only where the finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted).

¶13    DxNA also contends that the trial court erred in granting Grimm prejudgment interest at the rate of 10% per annum. The issue of whether a party is entitled to prejudgment interest is a question of law that we review for correctness. *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 32, 372 P.3d 629.

¶14    On cross-appeal, Grimm contends that the trial court erred in its interpretation of a "demand" under Utah Code sections 34-28-5(1)(b) and 34-27-1. "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (citation and internal quotation marks omitted).

ANALYSIS

I. Enforceable Contract

¶15    DxNA contends there was no enforceable employment agreement with Grimm.[4] Quoting *Nunley v. Westates Casing Services, Inc.*, 1999 UT 100, 989 P.2d 1077, DxNA asserts that

---

4. While Grimm argued before the trial court that DxNA breached the Missing Agreement, he does not reassert this argument on appeal. He instead argues that there is sufficient evidence to support the trial court's finding that the Final Proposal, not the Missing Agreement, was the agreement to which both parties had assented.

"[w]hether a contract has been formed is ultimately a conclusion of law," *id.* ¶ 17. But whether the parties *intended* an agreement to be binding is a question of fact, *Brasher v. Christensen*, 2016 UT App 100, ¶ 21, 374 P.3d 40. And "[a] finding of fact may be deemed clearly erroneous only if the finding is without factual support in the record[.]" *Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996) (citation and internal quotation marks omitted). It has long been the rule in Utah that to successfully challenge a factual finding, a party "must marshal all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah Ct. App. 1991) (emphasis omitted). Although the Utah Supreme Court clarified that the failure to marshal all the evidence in support of the court's findings is not a "technical deficiency" in the appellant's argument, it nevertheless "reaffirm[ed] the traditional principle of marshaling as a natural extension of an appellant's burden of persuasion." *State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645. So crucial is the task of marshaling, the Court warned, that appellants who fail to do it when assigning error to the trial court's findings of fact "will almost certainly fail to carry" their burden. *Id.* ¶ 42.

¶16 Here, DxNA fails to marshal the evidence supporting the trial court's findings on the intent issue and thus fails to demonstrate error with the finding that both parties mutually assented to the Final Proposal. This finding was based on evidence that "the parties['] conduct and all surrounding circumstances" indicated a clear intent to enter into an enforceable agreement. Because no signed agreement could be produced by either party, the court concluded the agreement was most likely "mislaid, misfiled, or otherwise missing in action by mistake." The court therefore determined that the best evidence of the terms of that agreement was the Final Proposal.

¶17 DxNA does not discuss the evidence supporting these findings but instead focuses on the evidence most favorable to its position. Because DxNA has not adequately marshaled the

evidence and has otherwise failed to carry its burden in demonstrating clear error, we presume that the evidence supports the trial court's finding of mutual assent to the terms offered in the Final Proposal. Accordingly, DxNA's challenge fails.

## II. Prejudgment Interest

¶18    DxNA contends that the trial court erred in granting Grimm prejudgment interest of 10% per annum. When the issue of prejudgment interest was before the trial court, DxNA raised no objection. Generally, an unpreserved issue raised for the first time on appeal is unreviewable, and "an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. DxNA failed to preserve this issue for appeal, but it argues that the exceptional circumstances doctrine applies. We reserve this doctrine for "the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would . . . result[] in manifest injustice." *Id.* ¶ 29 (citation and internal quotation marks omitted). One such circumstance is when a rare procedural anomaly has occurred, for instance, "where a change in law or the settled interpretation of law colors the failure to have raised an issue at trial." *Id.* ¶ 33 (brackets, citation, and internal quotation marks omitted).

¶19    DxNA argues that this is such a circumstance. After the trial court entered its original judgment on April 29, 2016, the Utah Supreme Court issued *USA Power, LLC v. PacifiCorp*, 2016 UT 20, 372 P.3d 629, substantially narrowing the availability of prejudgment interest under Utah Code section 15-1-1. *Id.* ¶ 109 (holding that prejudgment interest as described in section 15-1-1 refers "only to contracts for the loan or forbearance of any money, goods, or chose in action") (internal quotation marks omitted). DxNA therefore asserts that it did not have "occasion to further consider the issue," or to "evaluate the *USA Power* opinion and its potential application to this case in time to put [it] before the trial court in a meaningful way."

¶20    But *USA Power* was issued on May 16, 2016, and as of that date, the trial court had suspended its judgment to recalculate the damages DxNA owed to Grimm. An amended judgment was then entered on June 8, 2016. Because of the delay in the entry of final judgment, DxNA not only had several weeks between May 16 and June 8 when it could have called *USA Power* to the court's attention, but it also had 28 days from the entry of the amended judgment in which to file a motion to amend the judgment on the basis that the judgment was "contrary to law or based on an error in law." Utah R. Civ. P. 59(a)(7), (e). DxNA therefore had sufficient time to bring the change in the law to the trial court's attention and thus had an opportunity to preserve the issue for appeal.

¶21    For that reason, DxNA does not satisfy the requirements for a rare procedural anomaly under our exceptional circumstances doctrine. Our preservation rule therefore prevents us from considering the prejudgment interest issue.

### III. A Written Demand

¶22    On cross-appeal, Grimm argues that the trial court erred in not awarding him a statutory penalty or attorney fees for DxNA's failure to pay his wages.[5] The Utah Payment of Wages

---

5. Grimm raises a second issue on cross-appeal, contending that the trial court erred in failing to award damages for accrued PTO in 2008 and 2009. He argues that because the Final Proposal was backdated to 2008, he should have been awarded accrued PTO for 2008 and 2009. We review the interpretation of a contract for correctness with no deference to the trial court. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263. Section 2.2 of the Final Proposal provides that Grimm was entitled to "20 days of paid vacation each year during the Employment Term, which will accrue in conformity with the Employer's normal vacation pay practices." Accrual of PTO is determined by what the "normal vacation pay practices" of DxNA were during 2008

(continued…)

Act (the UPWA), *see* Utah Code Ann. §§ 34-28-1 to -19 (LexisNexis 2015), requires that an employer pay wages owed to an employee within 24 hours of termination,[6] *id.* § 34-28-5(1)(a). If an employer fails to pay wages within 24 hours of a "written demand" from an employee,[7] the employee can recover a statutory penalty that consists of accrued wages from the date the demand was made until the employer has paid those wages, not to exceed 60 days. *Id.* § 34-28-5(1)(c)(i). Moreover, Utah Code section 34-27-1 provides that attorney fees can be awarded if the "demand" for wages was made "at least 15 days before suit was brought." *Id.* § 34-27-1.

¶23　In this case, the trial court concluded that the Email did not constitute a "demand" under the UPWA or section 34-27-1 because Grimm did not "demand to be paid wages within 24 hours" and instead suggested "an alternative arrangement of payments over time with interest." In other words, the Email was an invitation for discussion and negotiation—not an actual demand.

---

(…continued)

and 2009. But Grimm offers no analysis on the interpretation of "normal vacation pay practices" or any citations to the record that might assist us in interpreting this part of section 2.2. We are not persuaded that the trial court erred merely because the agreement was backdated, and we therefore decline to disturb its decision in this regard.

6. In 2015, Utah Code section 34-28-5 was amended, resulting in a renumbering of this provision within the statute. For convenience, we refer to the updated numbering of this section rather than the numbering at the time of trial.

7. Grimm's assumption that an email constitutes a "written" demand is not disputed in this case.

¶24 Grimm contends the trial court misconstrued the meaning of "demand." The UPWA and section 34-27-1 provide no definition of "demand," so we are faced with a question of statutory interpretation. Because the UPWA and section 34-27-1 are within the same title of the Utah Labor Code and both refer to written demands for wages, we interpret "demand" to mean the same under both sections 34-27-1 and 34-28-5.

¶25 When interpreting a statute, "our primary goal is to evince the true intent and purpose of the Legislature." *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 (citation and internal quotation marks omitted). Our "first step of statutory interpretation is to evaluate the best evidence of legislative intent: the plain language of the statute itself." *In re Z.C.*, 2007 UT 54, ¶ 6, 165 P.3d 1206 (citation and internal quotation marks omitted). We therefore assume the language used by the Legislature was intended to be "construed in accordance with the ordinary meaning such words would have to a reasonable person familiar with the usage and context of the language in question." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. Our starting point for resolving the ordinary meaning of most words is the dictionary. *Rent-A-Center West, Inc. v. Utah State Tax Comm'n*, 2016 UT 1, ¶ 15, 367 P.3d 989.

¶26 A "demand" is the "assertion of a legal or procedural right." *Demand*, Black's Law Dictionary 495 (9th ed. 2009). Both parties refer to this definition, although Grimm contends that the ordinary meaning of "demand" under the statutory provisions is merely "an act of asking for something." But a "demand" is not a mere request; it is an insistent or forceful request. *See Demand*, New Oxford American Dictionary 460 (3d ed. 2010) ("an insistent and peremptory request, made as if by right"). Given that the UPWA provides that unpaid wages are due immediately upon termination and that the employer must therefore pay those wages within 24 hours, the Legislature cannot have intended a "written demand" to be satisfied when an employee asks for his wages to be paid at the convenience of the employer or when negotiation might eventually require. This

would be contrary to the understanding of the term "demand" and to the 24-hour time requirement of the UPWA. To satisfy the statutory requirements, it must therefore be apparent from the writing that the employee is insisting that the employer pay all wages owed immediately.

¶27    In this case, there was no such demand because the Email does not insist that DxNA pay Grimm's wages immediately. First, the Email does not specifically address wages—a significant omission. The UPWA and section 34-27-1 are limited to "wages," defined by the UPWA as "amounts due the employee for labor or services, whether the amount is fixed or ascertained on a time, task, piece, commission basis or other method of calculating such amount." Utah Code Ann. § 34-28-2(1)(i) (LexisNexis Supp. 2017). In contrast, the focus of the Email is on various amounts that DxNA owed Grimm, with almost no discussion of wages other than the attachment of a file containing Grimm's reconciliation of his unpaid salary.

¶28    Second, Grimm did not insist that DxNA remit his unpaid salary immediately. Instead, the Email proposes settling the amounts that DxNA owed Grimm on terms to be mutually agreed upon and in such a way as to not jeopardize DxNA financially.[8] Specifically, Grimm offered to "find an acceptable means of getting this balance paid," even suggesting that the amounts be treated as loans with an interest rate of 12%. It therefore would not have been clear to DxNA from the Email that Grimm was making a demand for the immediate payment of his wages. Furthermore, there was no suggestion of urgency in the Email; no demand that DxNA pay right away, as the UPWA contemplates. Instead, Grimm advised that it would be a week before he could go over the amounts owed with DxNA and "make any adjustments needed." In contrast, a written

---

8. This concern by a terminated employee for his former employer's financial stability may seem peculiar at first blush, but Grimm was, after all, also an owner of DxNA.

demand under section 34-28-5(c) must reflect that the employer has to pay immediately. Because Grimm did not demand that he be paid immediately for purposes of the UPWA and section 34-27-1, we conclude that he is not entitled to a statutory penalty or attorney fees for DxNA's failure to pay his wages within 24 hours of the Email.

CONCLUSION

¶29   We conclude that there was no error in the trial court's determination that there was an enforceable employment agreement between Grimm and DxNA. DxNA failed to preserve the issue of prejudgment interest. And the Email from Grimm did not constitute a written demand for purposes of the applicable statutes. We accordingly affirm.

———————