268 F.3d 910 (9th Cir. 2001)
 HUMETRIX, INC., A CALIFORNIA CORPORATION; BETTINA EXPERTON, DOCTOR, PLAINTIFFS-APPELLEES,
v.
GEMPLUS S.C.A., A FRENCH CORPORATION; GUY GUISTINI, DEFENDANTS-APPELLANTS,
AND
MARC LASSUS; BRUNO LASSUS, DOCTOR; INOVACTION S.A.R.L., A FRENCH CORPORATION; PIERRE ANDREI; MAX MICOUD, DOCTOR, DEFENDANTS.
HUMETRIX, INC., A CALIFORNIA CORPORATION, PLAINTIFF-APPELLEE,
AND
BETTINA EXPERTON, DOCTOR, PLAINTIFF,
v.
GEMPLUS S.C.A., A FRENCH CORPORATION; MARC LASSUS; BRUNO LASSUS, DOCTOR; GUY GUISTINI; PIERRE ANDREI; MAX MICOUD, DOCTOR, DEFENDANTS,
AND
INOVACTION S.A.R.L., A FRENCH CORPORATION, DEFENDANT-APPELLANT.
 Nos. 99-56068, 00-55636
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued March 6, 2001
Submitted September 21, 2001
Filed October 4, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Peter W. Davis, Crosby, Heafey, Roach & May, Oakland, California; Andrew L. Deutsch, Piper Marbury Rudnick & Wolfe, New York, New York, for the defendants-appellants.
 Sarah R. Wolff, Sachnoff & Weaver, Chicago, Illinois, for the plaintiffs-appellees.
 Stuart E. Schiffer, Acting Assistant Attorney General, and Barbara C. Biddle and Jeffrey Clair, Department of Justice, Civil Division, Appellate Staff, Washington, D.C., amicus curiae.
 Appeal from the United States District Court for the Southern District of California; Napoleon A. Jones, District Judge, Presiding. D.C. No. CV-96-00216-NAJ/JFS
 Before: Kozinski and Tallman, Circuit Judges, and Fogel,* District Judge.
 Richard C. Tallman, Circuit Judge:
 
 
 1
 Happy contractual relationships are all alike; but every unhappy contractual relationship is unhappy in its own way.[1]
 
 
 2
 In this case, a United States health care consulting company, Humetrix, Inc. ("Humetrix"), contracted with the world's leading manufacturer of Smart Card technology, Gemplus S.C.A. ("Gemplus"), to provide portable patient data storage solutions to the United States health care market.[2] By all indications, Gemplus and Humetrix were poised on the threshold of a promising business opportunity. Humetrix labored industriously to capitalize on this opportunity, raising finances, increasing its sales staff, and developing a client base in the United States.
 
 
 3
 Unbeknownst to Humetrix, however, two events occurred within Gemplus that threatened the vitality of their partnership. First, Guy Guistini, a Gemplus senior manager and the progenitor of the French health care Smart Card program, learned that Humetrix had registered the trademark"Vaccicard" in the United States. Guistini was a 45% shareholder in Inovaction S.A.R.L. ("Inovaction"), a French company that held the French trademarks "Vaccicarte" and"Vaccicard." Second, Gemplus acquired a new U.S. subsidiary that could perform many of the functions that Humetrix was to have performed as Gemplus's American partner.
 
 
 4
 As a result of these events, Gemplus's cooperative efforts with Humetrix came to a grinding halt. For more than a month, Gemplus ignored Humetrix's increasingly urgent entreaties to honor the parties' agreements. Finally, Gemplus explained that, contrary to its prior representations, it viewed Humetrix not as its partner, but merely as a reseller. Humetrix had already invested significant time and resources in market research, client development, and product development, and had closed contracts with two California counties.
 
 
 5
 Humetrix sued Gemplus for breach of contract and breach of its fiduciary duty as Humetrix's partner. Humetrix also sued Guistini for intentional interference with contractual relations and Inovaction seeking a declaration that Humetrix was entitled to use the "Vaccicard" trademark in the United States. The jury awarded Humetrix $15 million in damages for breach of contract and breach of fiduciary duty. The jury also declared that Humetrix was entitled to use the trademark "Vaccicard" in the U.S. market.
 
 
 6
 Gemplus argues on appeal that the district court erred by: (1) allowing the jury to consider evidence of two oral agreements between the parties; (2) allowing the jury to consider evidence of lost profit damages despite Humetrix's use of equitable estoppel to overcome the statute of frauds; (3) allowing the jury to consider the testimony of Humetrix's experts regarding lost profits; (4) excluding evidence of Humetrix's attempts to contract with a replacement supplier of Smart Cards; and (5) entering judgment on a jury verdict that resulted from passion, confusion, or wild speculation.
 
 
 7
 Inovaction argues on appeal that the district court erred by: (1) holding that Humetrix's trademark application comported with the Lanham Act; and (2) entering judgment based on the jury's determination that Humetrix's trademark application was valid and prior to Inovaction's when there was insufficient evidence to support that determination.
 
 
 8
 We have jurisdiction under 28 U.S.C. &#167 1291, and we affirm.
 
 I.
 
 9
 In 1994, Gemplus's Health Applications Sales Manager, Dr. Bruno Lassus, spoke at a medical conference about health care applications of Smart Card technology. Humetrix's founder, president, and sole shareholder, Dr. Bettina Experton, was among those in attendance. She approached Dr. Lassus after his presentation, and the two struck up a conversation about opportunities in the United States for Smart Card technology. Gemplus had no presence to speak of in the United States, and Dr. Lassus was impressed and enticed by Dr. Experton's suggestions.
 
 
 10
 Humetrix and Gemplus began negotiations that spanned much of the next year. Dr. Experton visited Gemplus's headquarters in France on three occasions. Drs. Experton and Lassus initially envisioned Humetrix only as a U.S. reseller of Gemplus's Smart Card products because Gemplus already had a U.S. subsidiary, Gemplus Card International Corp. ("Gemplus USA"). At Dr. Lassus's request, Humetrix negotiated an Agency Agreement with Gemplus USA.
 
 
 11
 Dr. Lassus became increasingly impressed, however, with the opportunities available in the United States and with Humetrix's ingenuity and resourcefulness in exploiting those opportunities. As Humetrix earned a more prominent role in Gemplus's efforts to penetrate the U.S. health care market, Drs. Lassus and Experton discussed a new role for Humetrix, a role as Gemplus's partner. The negotiations proceeded, in the words of Dr. Lassus, "discreetly so as not to hurt Gemplus [USA]."
 
 
 12
 In April 1995, Dr. Lassus visited Gemplus USA and was disappointed to discover that Gemplus USA had not organized any meetings with U.S. health care companies. By contrast, Dr. Lassus reported that during a subsequent visit with Humetrix, Dr. Experton secured meetings with a number of important decision-makers in the U.S. health care industry. Dr. Lassus concluded that Humetrix was uniquely qualified to engineer Gemplus's successful entrance into the U.S. market. He observed, by contrast, that "neither Gemplus[USA] nor our competitors know how to tackle the U.S. health care market." Dr. Lassus continued to feel that "[t]he U.S. represents an extraordinary market for our technology in the health care and social services area."
 
 
 13
 By May, Gemplus and Humetrix were engaged in what Dr. Lassus described as a "pure partnership/collaboration." As Dr. Experton wrote shortly thereafter to a potential investor, Humetrix had "already generated firm orders and more interest than [Humetrix's] development and sales forces [we]re able to handle." Dr. Lassus directed Dr. Experton to draft an agreement between Humetrix and Gemplus reflecting their "partnership" and a new compensation scheme pursuant to which, in addition to the commission provided by the Agency Agreement with Gemplus USA, Humetrix was to keep the full margin of each unit sold in the United States. Humetrix drafted such an agreement, entitled the Representative Agreement, and sent it to Gemplus to be signed.
 
 
 14
 Dr. Lassus also encouraged Dr. Experton to develop a name for the vaccination Smart Card they intended to offer on the U.S. market and to obtain legal protection for that name. After researching market reaction to several names, Dr. Experton settled on "Vaccicard." Humetrix applied to register the trademark "Vaccicard" on June 14, 1995.
 
 
 15
 In July and August 1995, even as Humetrix closed contracts with two California counties and expanded its sales and development resources to meet the burgeoning supply of U.S. health care clients, its partnership with Gemplus suffered two setbacks.
 
 
 16
 First, Guy Guistini learned that Humetrix had registered the trademark "Vaccicard" for use in the United States. Guistini was the progenitor of the French Smart Card application that stored vaccination records. In addition to being the"personal adviser" to Gemplus's president, he held 45% of the shares of Inovaction, the French company that registered the trademarks "Vaccicarte" and "Vaccicard" in France. Guistini insisted that Inovaction hold the American trademark as well. He ordered Dr. Experton to withdraw Humetrix's trademark application and to stop using the Vaccicard trademark. When Dr. Experton did not accede to his demands, Guistini resorted to threats and intimidation. Inovaction filed its own American trademark application on July 19, 1995, more than a month after Humetrix's application.
 
 
 17
 Second, Gemplus acquired a new U.S. subsidiary. At Dr. Lassus's direction, Gemplus USA refrained from mentioning the acquisition to Dr. Experton.
 
 
 18
 As August drew to a close, Dr. Experton again visited France. Dr. Lassus and Gemplus's president assured her that Gemplus would execute the Representative Agreement at a meeting during her visit. Gemplus first rescheduled, then canceled, the meeting, however, and Dr. Experton returned to the United States without an executed Representative Agreement in hand.
 
 
 19
 After Dr. Experton returned to the United States, Gemplus's communication and cooperation stopped abruptly. In the ensuing six weeks, Humetrix tried in vain to communicate with Gemplus. As the deadline for performance of Humetrix's contracts with its U.S. purchasers neared, Gemplus ignored Humetrix's entreaties to cooperate or, at the very least, communicate. Humetrix sent increasingly desperate memoranda to Gemplus portending increasingly dire consequences if Gemplus and Humetrix did not re-establish contact and deliver a product to their customers in the United States. In late September, Dr. Experton sent Dr. Lassus a four-page letter, imploring Gemplus to cooperate with Humetrix in meeting customer demands.
 
 
 20
 Finally, by telephoning Gemplus's office and pretending to be someone else, Dr. Experton succeeded in reaching Dr. Lassus on October 3. Their conversation, as chronicled by Dr. Experton's letter of the following day, was a frustrating procession of dissembling explanations and hollow reassurances. On October 16, Gemplus's president wrote Dr. Experton that the Agency Agreement between Humetrix and Gemplus USA was the only agreement between them, that Humetrix was "not entitled to hold the trademark Vaccicard in the USA since Gemplus already holds a worldwide license to this product," and that Humetrix bore no ownership interest in the Vaccicard software to be marketed in the United States. The letter closed with the rebuke: "It does not seem to me appropriate to maintain hostility with my personal adviser Guy Guistini who originated the Vaccicarte project and who has all of my confidence in this sphere as in other spheres within his competence." A draft of the letter produced during discovery revealed that Guistini himself had dictated the letter for the president's signature. Without Gemplus's cooperation, Humetrix was forced to cancel its contracts with customers in the United States.
 
 
 21
 In February 1996, Humetrix sued Gemplus, Inovaction, and Guistini. Because Gemplus never executed the Representative Agreement, Humetrix made no claims for breach of its terms. Instead, Humetrix alleged that the discussions between Humetrix and Gemplus culminated in the formation of two oral contracts, the Sales Agreement and the Partnership Agreement, and that Gemplus breached them both. Humetrix attributed Gemplus's breach, in part, to the interference of Guistini, for which Humetrix sought compensatory and punitive damages. Finally, Humetrix sought a declaration that it had properly registered the trademark "Vaccicard " in the United States.
 
 
 22
 Gemplus countered that the Agency Agreement constituted the sole agreement between Humetrix and Gemplus or its subsidiaries and moved to compel arbitration in accordance with the Agency Agreement's mandatory arbitration clause. The district court denied Gemplus's motion. On interlocutory appeal, we affirmed on the grounds that "Gemplus was not a party to the Agency Agreement that contained the arbitration provision," only Gemplus USA and Humetrix were parties to the Agency Agreement, and that "Humetrix enjoyed a distinct and separate contractual relationship with parent company Gemplus." Humetrix, Inc. v. Gemplus, S.C.A., No. 97-55080, 1997 WL 683301, at *1, *3 (9th Cir. Oct. 23, 1997) (unpublished disposition; see 9th Cir. R. 36-3).
 
 
 23
 Humetrix's claims against Gemplus, Guistini and Inovaction were tried before a jury. The jury found that Humetrix and Gemplus entered into the Sales Agreement and the Partnership Agreement. The jury further found that:
 
 
 24
 1. Gemplus breached the Sales Agreement, damaging Humetrix in the amount of $5 million;
 
 
 25
 2. Gemplus breached the Partnership Agreement, damaging Humetrix in the amount of $10 million;
 
 
 26
 3. Guistini intentionally interfered with Humetrix's contractual relations, damaging Humetrix in the amount of $1.2 million;
 
 
 27
 4. Guistini's conduct warranted an award of punitive damages to Humetrix in the amount of $1.3 million; and,5. Humetrix was the proper legal owner of the Vaccicard trademark in the United States.
 
 Gemplus and Inovaction appeal.[3]
 II.
 A.
 
 28
 Gemplus argues that Gemplus USA entered the Agency Agreement as Gemplus's agent; that Gemplus is therefore a party to the Agency Agreement; that Agency Agreement's integration clause bars all evidence of the two oral agreements; and that the district court therefore erred by allowing the jury to consider such evidence. Gemplus advanced this argument before us in its prior interlocutory appeal of the district court's order denying its motion to compel arbitration. We ruled that the mandatory arbitration clause did not apply because "Gemplus was not a party to the Agency Agreement . . . . Humetrix enjoyed a distinct and separate contractual relationship with . . . Gemplus." Humetrix, Inc. v. Gemplus, S.C.A., supra. We are precluded by the law of the case doctrine from revisiting this issue. See United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000).
 
 
 29
 Gemplus correctly points out that the law of the case doctrine applies only if "the issue in question[was] `decided explicitly or by necessary implication in [the ] previous disposition." Id. (quoting Liberty Mut. Ins. Co. v. EEOC, 691 F.2d 438, 441 (9th Cir. 1982)). Gemplus argues that our prior panel cannot have decided the issue on the merits because discovery had not yet occurred and the panel had before it only Humetrix's Complaint and the Agency Agreement. The Agency Agreement contains an integration clause, however, that permits interpretation without reference to evidence outside its four corners. The prior panel thus had everything it needed to determine on the merits that Gemplus was not a party to the Agency Agreement. Its decision is the law of the case.
 
 
 30
 Even if the law of the case doctrine did not preclude us from addressing Gemplus's argument, the judicial estoppel doctrine would preclude us from accepting it. Judicial estoppel, also known as "preclusion of inconsistent positions," prohibits a litigant from asserting inconsistent positions in the same litigation. Yniguez v. Arizona, 939 F.2d 727, 738 (9th Cir. 1991), vacated on other grounds sub nom. Arizonans for Official English v. Arizona, 520 U.S. 43 (1997). The doctrine is "commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding . . . ." Id.
 
 
 31
 In Yniguez, the Arizona Attorney General persuaded the district court that he should not be a party to the litigation. The district court dismissed the Attorney General before ruling on the merits. The Attorney General disagreed with the decision on the merits, however, and sought to be reinstated as a party so he could appeal the decision. We concluded that judicial estoppel prevented the Attorney General from undertaking such a "reversal in position."
 
 
 32
 Gemplus argued before the district court that it was in privity to a party to the Agency Agreement; that it was a third-party beneficiary to the Agency Agreement; and that it was not a party to the Agency Agreement. After its failed attempt to invoke the Agency Agreement's arbitration clause, however, Gemplus did not argue that Gemplus USA executed the Agency Agreement as Gemplus's agent. To the contrary, in its Amended Answer, Gemplus admitted that the Agency Agreement "was entered into between Gemplus Card International Corp. ("Gemplus USA") and Humetrix. " As trial neared, Gemplus assured the district court that"Gemplus France does not contend, nor will it that the Agency Agreement is an agreement between Gemplus France and Humetrix as opposed to an agreement with Gemplus USA." (Emphasis in original).
 
 
 33
 Gemplus asks us to condone precisely the sort of reversal in position that we condemned in Yniguez. After arguing at trial that it was not a party to the Agency Agreement, Gemplus now seeks to reverse its position because it is dissatisfied with the jury's verdict. The doctrine of judicial estoppel prevents such a change in position.
 
 B.
 
 34
 Gemplus asserts that because Humetrix invoked equitable estoppel to bar Gemplus from raising the statute of frauds as a defense to Humetrix's breach of contract claims, the district court was required as a matter of law to limit damages on those claims "the amount expended in reliance on the unenforceable promise . . . not . . . the profits [it ] hoped to obtain as a result." We review de novo the district court's determination that as a matter of law Humetrix's invocation of equitable estoppel did not prevent it from recovering lost profits. See United States v. Sims (In re Feiler), 218 F.3d 948, 951 (9th Cir. 2000). The district court properly determined that Humetrix is not barred from recovering lost profits merely because it invoked equitable estoppel.
 
 
 35
 Gemplus's argument conflates promissory estoppel with equitable estoppel. As we have observed, however, promissory estoppel and equitable estoppel are distinct concepts with distinct uses and effects. See Jablon v. United States, 657 F.2d 1064, 1068 (9th Cir. 1981). "[P]romissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have . . . . Promissory estoppel is a sword, and equitable estoppel is a shield." Id. Humetrix used equitable estoppel to bar Gemplus from raising the statute of frauds as a defense to Humetrix's claims for breach of the Sales Agreement and the Partnership Agreement. See Housley v. Haywood (Estate of Housley), 65 Cal. Rptr. 2d 628, 638 (Ct. App. 1997) ("[E]quitable estoppel may apply to avoid the statute[ ] of fraud[s] and to make an oral agreement enforceable . . . .").
 
 
 36
 That Humetrix used equitable estoppel to defeat Gemplus's statute of frauds defense has no bearing on the damages Humetrix may recover. The kind of damages a party may recover is determined by the kind of claim it brings and by the evidence it adduces. Humetrix's claims against Gemplus are for breach of contract. That was the theory under which Humetrix brought suit, and the theory under which the jury found Gemplus liable and awarded damages to Humetrix. Accordingly, Humetrix may recover damages appropriate to a breach of contract claim.
 
 
 37
 Under California law, a plaintiff that prevails on a breach of contract claim "should receive as nearly as possible the equivalent of the benefits of performance," meaning the plaintiff should be put "in as good a position as he would have been had performance been rendered as promised." Brandon & Tibbs v. George Kevorkian Accountancy Corp., 277 Cal. Rptr. 40, 47 (Ct. App. 1990). This may include lost profits if the plaintiff can prove that the defendant's failure to perform caused the plaintiff to lose profits. See id. at 48-49.
 
 C.
 
 38
 Gemplus contends that the district court erred by admitting Humetrix's damages experts' testimony regarding lost profits. Gemplus claims that the testimony was speculative and was unsupported by the evidence. District courts, in their capacity as evidentiary gatekeepers, have broad discretion in deciding what evidence is relevant, reliable, and helpful to the trier of fact. Desrosiers v. Flight Int'l of Florida Inc., 156 F.3d 952, 961 (9th Cir. 1998); Shore v. Mohave, Arizona , 644 F.2d 1320, 1322 (9th Cir. 1981). We review for abuse of discretion the district court's decision to admit expert testimony. United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir.), cert. denied, 530 U.S. 1268 (2000).
 
 
 39
 Both we and California state courts have recognized that lost profits are "necessarily an estimate, " Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co., 153 F.3d 938, 947 (9th Cir. 1998), cert. denied, 526 U.S. 1064 (1999), and that their "amount cannot be shown with mathematical precision." Berge v. Int'l Harvester Co., 190 Cal. Rptr. 815, 822 (Ct. App. 1983). We uphold awards of lost profit damages so long as they are supported by substantial evidence. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1024 (9th Cir. 1985); Heiner v. Kmart Corp., 100 Cal. Rptr. 2d 854, 863 (Ct. App. 2000).
 
 
 40
 Humetrix's request for lost profit damages is supported by the testimony of two experts. The experts based their testimony on contracts Humetrix had closed, pilot projects for which Humetrix had received commitments, and contracts in negotiation at the time of breach; Humetrix's partnership with Gemplus, the world's leading manufacturer of Smart Cards; Gemplus's success in foreign markets; Dr. Experton's contacts with government health care officials; and market forecasts, including Gemplus's own. Their testimony is borne out by Gemplus's own contemporaneous observations that"the real market boom is still ahead of us," and that"the U.S. represents an extraordinary market for our technology in the health care and social services area." Humetrix's request for lost profits was supported by substantial evidence.
 
 
 41
 To the extent Gemplus sought to challenge the correctness of Humetrix's experts' testimony, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses. Gemplus availed itself of both of these opportunities. Gemplus cross-examined Humetrix's experts and presented its own expert.
 
 
 42
 Authority to determine the victor in such a "battle of expert witnesses" is properly reposed in the jury. Wyler Summit P'ship v. Turner Broad. Sys., Inc., 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury."). As one California court of appeal observed:
 
 
 43
 As to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence. It is for the trier of fact to accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial court's award of lost profits.
 
 
 44
 Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 54 Cal. Rptr. 2d 888, 903 (Ct. App. 1996) (internal quotations and citations omitted); see also Flavor Dry, Inc. v. Lines (In re James E. O'Connell Co., Inc.), 799 F.2d 1258, 1261-62 (9th Cir. 1986) (applying California law) (declining to overturn lost profit award based on expert testimony supported by financial statements, data pertaining to similar businesses, and market forecasts). Humetrix's experts based their testimony on substantial evidence. The district court did not abuse its discretion by allowing the jury to weigh the conflicting testimony of the parties' experts regarding lost profit damages.
 
 
 45
 Gemplus also argues that lost profit damages are inappropriate for a "new business" because, without a record of past performance as a standard, future profits are necessarily speculative. In light of the "new business rule," Gemplus argues, the district court abused its discretion by allowing the jury even to consider Humetrix's future profits in determining its damages.
 
 
 46
 The new business rule is more empirical than normative, however. As an empirical matter, new businesses often cannot offer reliable proof of prospective profits. As a normative matter, if a business can offer reliable proof of profits, there is no reason to deprive it of the profits it would have garnered had the contract been performed merely because it is "new." As one California court put it: "[T]he [new business] rule is not a hard and fast one and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." Gerwin v. Southeastern California Ass'n of Seventh Day Adventists, 92 Cal. Rptr. 111, 119 (Cal. Ct. App. 1971).
 
 
 47
 Moreover, Humetrix was not exactly a new business. When it contracted with Gemplus it had been offering health care consulting and information systems services to the California and national markets for ten years. See Maggio, Inc. v. United Farm Workers, 278 Cal. Rptr. 250, 264 (Ct. App. 1991) ("Cases applying the `new business rule' generally involve businesses which have been in operation only a very short period of time."). Indeed, the experience, the contacts, and the dynamism of its principal, Dr. Experton, led Dr. Lassus to observe that Humetrix was uniquely capable of successfully marketing Smart Card technology in the United States.
 
 
 48
 Humetrix's experts were also able to draw on Gemplus's own experience introducing Smart Card technology into previously untapped markets. Humetrix's profits were, in a sense, dependent on and derivative of Gemplus's profits so that if one could be determined reliably, the other followed as a matter of course. Under these circumstances, the profits Humetrix could expect to garner from its contracts with Gemplus were not so speculative that the district court abused its discretion by allowing the jury to hear evidence regarding profits.
 
 D.
 
 49
 Gemplus argues that the district court abused its discretion by excluding evidence that Humetrix identified another supplier of Smart Cards but was still unable to sell its product. "A trial court has great latitude in the admissibility of evidence. Decisions whether evidence is relevant and whether its probative value outweighs unfair prejudice to [a party] are committed to the court's sound discretion." United States v. Gilley, 836 F.2d 1206, 1213 (9th Cir. 1988) (citations omitted).
 
 
 50
 Other than its own unsubstantiated allegations, Gemplus offered no evidence that Humetrix contracted, or could have contracted, with a replacement supplier. The district court did not abuse its discretion by excluding Gemplus's unsubstantiated allegations.
 
 E.
 
 51
 Gemplus argues, finally, that the district erred by entering the jury's $15 million award of damages, an award Gemplus claims could only be the result of passion, confusion, or wild speculation by the jury. Our role in reviewing a jury award entered under California law is limited:
 
 
 52
 [A]s a reviewing court, we view the evidence through a different lens than does the trier of fact. The judgment comes to us cloaked with the presumption that it is correct. In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor. We may interfere with an award of damage only when it is so large that it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.
 
 
 53
 Westphal v. Wal-Mart Stores, Inc., 81 Cal. Rptr. 2d 46, 48 (Ct. App. 1998).
 
 
 54
 Humetrix and Gemplus were poised at the inception of a promising business opportunity--to provide a technological breakthrough in personal health care documentation to government and private health care entities around the country. Gemplus's similar foreign endeavors had been very profitable. Gemplus was confident that its campaign in the United States would be equally profitable. Under these circumstances, the jury's determination that Humetrix could have earned $15 million in net profits over the ensuing five years does not shock the conscience or suggest passion, prejudice, or corruption. The district court did not abuse its discretion by entering the jury's verdict on damages as the proper judgment.
 
 F.
 1.
 
 55
 Inovaction contends that Humetrix's trademark application could not properly have received a filing date (establishing its priority over Inovaction's subsequently filed application) because the application did not conform to the Lanham Act. We "review de novo the district court's legal analysis and interpretation of the Lanham Act." Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F.3d 704, 710 (9th Cir. 1999).
 
 
 56
 We note at the outset that the Lanham Act, the law governing registration of trademarks, has changed during the pendency of Humetrix and Inovaction's dispute. When Humetrix filed its application on June 14, 1995, the governing statute provided that a person who intended to use a trademark in commerce could request registration of that mark by submitting to the Patent & Trademark Office ("PTO") a written application, "including" a prescribed statement, along with a filing fee. See 15 U.S.C. &#167 1051(b)(1)(A) (1994). The PTO would accord the submission a filing date, establishing its priority over all subsequently filed applications, if it included information regarding the applicant, a drawing of the mark, a list of the goods and services in connection with which the mark was to be used, and a verified declaration that neither the mark nor one similar enough to cause confusion in the marketplace was currently in use. See 37 C.F.R. &#167 &#167 2.21 & 2.33(b) (1989).
 
 
 57
 In 1996, however, the PTO suspended proceedings regarding Humetrix's application after Humetrix filed suit in federal court requesting, among other things, declaratory relief that it was entitled to use the Vaccicard mark in commerce. See 37 C.F.R. &#167 2.117 (a) ("Whenever . . . a party or parties to a pending [trademark registration dispute] are engaged in a civil action . . . which may have a bearing on the case, proceedings . . . may be suspended until termination of the civil action . . . ."). PTO proceedings regarding Humetrix's application to register the Vaccicard mark have remained pending during this lawsuit.
 
 
 58
 On October 30, 1998, Congress enacted sweeping amendments to the trademark registration procedures set forth in the Lanham Act. See Pub. L. No. 105-330, 112 Stat. 3069 (1998). The amended statute no longer requires an application for registration to include a verified statement; rather, it requires submission of an application and a verified statement as separate requirements to registration. See 15 U.S.C. &#167 1051(b)(1)-(3) (2000). The implementing regulations were amended to reflect this change in &#167 1051(b). The PTO now requires would-be registrants to submit only an application, not a verified statement, in order to receive a filing date. See 37 C.F.R. &#167 2.21 (2000).
 
 
 59
 Congress expressly stated that the amended application procedures were to apply to "any application for registration of a trademark pending on, or filed on or after, the effective date of this Act." Pub. L. No. 105-330, &#167 109(b), 112 Stat. 3069 (1998); cf. &#167 201(b) (providing that the amendments made in &#167 201(a) "shall apply only to any civil action filed or proceeding before the United States Patent and Trademark Office commenced on or after such date relating to the registration of a mark."). When the amendments became effective on October 30, 1999, Humetrix's application was still pending before the PTO.
 
 
 60
 In general, our jurisprudence harbors an aversion to retroactivity, grounded in "[e]lementary considerations of fairness." Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994). Accordingly, a "presumption against retroactive legislation" prevails, id., absent a "clear indication from Congress that it intend[s]" that new legislation apply retroactively. INS v. St. Cyr, ___U.S.___, 121 S. Ct. 2271, 2288 (2001). If Congress does express such an intent, it is "beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." Id. The Supreme Court has recognized that certain classes of "[r]etroactivity provisions often serve entirely benign and legitimate purposes." Landgraf, 511 U.S. at 267-68. Provisions that effect "changes in procedural rules," such as the amendments to the trademark registration provisions here at issue, constitute one such class of retroactive provisions. Id. at 275; see also FDIC v. Craft, 157 F.3d 697, 703 (9th Cir. 1998) (noting previous holding that a "statute of limitations provision, as procedural rather than substantive, applied retroactively"); Nebraska, Ex Rel., Dep't of Soc. Serv. v. Bentson, 146 F.3d 676, 678 (1998) (noting that removal statute "regulates jurisdiction and procedure" and therefore may be applied "to cases pending at the time of its enactment").
 
 
 61
 Where, as here, Congress makes clear its intent to apply an amendment of a procedural provision retroactively, courts must honor and effectuate that intention. We must determine, then, as Congress has directed, whether Humetrix's application is entitled to a filing date under the procedural requirements of the amended statute and implementing regulations.
 
 
 62
 We conclude that Humetrix's submission, which contains information regarding the applicant, a drawing of the mark, a list of the goods and services in connection with which the mark is to be used, and a filing fee, meets those requirements. See 37 C.F.R. &#167 2.21(a) (2000). Accordingly, we affirm the jury's decision that Humetrix's June 14, 1995, application entitled it to a filing date and to priority over all subsequently filed applications for registration.
 
 2.
 
 63
 Inovaction argues, in the alternative, that the evidence presented to the jury was insufficient to support a verdict that Humetrix filed a prior trademark application. We have consistently held that to preserve the ability to challenge the sufficiency of the evidence on appeal, a party must move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) at the close of all evidence and renew its motion or move for judgment notwithstanding the verdict or for a new trial under Rule 50(b) after the jury has returned a verdict. See Desrosiers v. Flight Int'l of Florida Inc., 156 F.3d 952, 956-57 (9th Cir. 1998). Inovaction did neither.
 
 
 64
 Inovaction did not move for judgment as a matter of law at the close of evidence. Part way through defendants' presentation of their own case, the following exchange occurred:
 
 
 65
 Mr. Devereaux: I just wanted to confirm that the Rule 50 motions the court will hear after the case has been submitted.
 
 
 66
 The Court: I will hear the Rule 50 motions after the case. It's been preserved.
 
 
 67
 Mr. Deutsch [Counsel for Inovaction]: And renewed?
 
 
 68
 The Court: And renewed.
 
 
 69
 Asking if one will have the opportunity to make a motion and making a motion are two different things, however. Rule 50(a) requires that a motion for judgment as a matter of law "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Fed. R. Civ. P. 50(a). Moreover, we construe strictly the requirement that a Rule 50(a) motion be made at the close of evidence. See Patel v. Penman, 103 F.3d 868, 878 (9th Cir. 1996); Johnson v. Armored Transp. of California, Inc., 813 F.2d 1041, 1042 (9th Cir. 1987). Inovaction failed properly to move for judgment as a matter of law at the close of evidence.
 
 
 70
 Inovaction also failed to renew its motion or to move for judgment notwithstanding the verdict or for a retrial. Unlike Gemplus and Guistini, Inovaction did not file a Rule 50(b) motion after the jury returned its verdict.
 
 
 71
 Inovaction attempts to overcome its Rule 50 inadequacies by relying on Reeves v. Teuscher, 881 F.2d 1495 (9th Cir. 1989). In Reeves, the Court held:
 
 
 72
 Although courts construe strictly the requirement that a motion be made after a case-in-chief, they are generally more liberal about what suffices as a motion for a directed verdict after the close of all the evidence. Fed. R. Civ. P. 50(b) may be satisfied by an ambiguous or inartfully made motion for a directed verdict or by an objection to an instruction for insufficient evidence to submit an issue to the jury.
 
 
 73
 Id. at 1498 (citations omitted). Unlike the party in Reeves, however, Inovaction never made a Rule 50 motion. Even if the utterance "and renewed" were sufficient to satisfy Rule 50(a), and it is not, Inovaction failed to follow it up with anything that might be construed as a motion under Rule 50(b). Inovaction's reliance on Reeves is misplaced. The record contains no evidence that Inovaction's counsel made a Rule 50 motion, even ambiguously or inartfully. Accordingly, Inovaction waived its right to challenge on appeal the sufficiency of the evidence and the jury's verdict must be affirmed.
 
 III.
 
 74
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable Jeremy D. Fogel, United States District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 See Leo Tolstoy, Anna Karenina 1 (C. Garnett trans. 1933).
 
 
 [2]
 A Smart Card is a credit card-sized microprocessor that stores data files. With the proper hardware, the data files can be downloaded, viewed, updated, and restored. Smart Cards also contain security protocols that protect the confidentiality of the data stored on them. The initial health care application envisioned by Humetrix and Gemplus permitted a cardholder to maintain his or her current immunization records in this computerized credit card storage medium.
 
 
 [3]
 The district court vacated the punitive damages award against Guistini, and Humetrix and Guistini subsequently settled.