2007 UT 28

**Robert L. YOUNGBLOOD, II,**
**Plaintiff and Respondent,**

v.

**AUTO–OWNERS INSURANCE**
**COMPANY, a corporation,**
**Defendant and Petitioner.**

No. 20050400.

Supreme Court of Utah.

March 23, 2007.

Peter C. Collins, Salt Lake City, for plaintiff.

Robert R. Wallace, Salt Lake City, for defendant.

WILKINS, Associate Chief Justice:

¶ 1 Mr. Youngblood seeks to extend the coverage of an insurance policy under the doctrine of equitable estoppel. He admits that the language of the policy does not extend coverage under these circumstances, but relies on representations of the scope of coverage made by the insurance agent in selling him the policy. On summary judgment, the district court held him to the language of the policy, but on appeal, the court of appeals agreed in principle and reversed on the basis of material issues of fact precluding summary judgment.

¶ 2 On certiorari, we have agreed to review the court of appeals' legal conclusion that an insured may rely upon principles of equitable estoppel to enlarge the scope of an insurance policy's coverage where the company's agent materially misstates the scope of coverage prior to the purchase of the policy. We

conclude that estoppel may apply under some factual circumstances and remand for further action in the district court.

## BACKGROUND

¶ 3 Mr. Youngblood was struck by an automobile as he walked across the parking lot of a medical plaza. The driver, Ms. Cooksey, carried $50,000 in available liability insurance and settled Mr. Youngblood's claim for the $50,000 policy limit. He claims, however, that his damages exceed $50,000 and accordingly seeks additional coverage pursuant to the underinsured driver provisions of his own insurance policy from Auto–Owners Insurance Co. ("Auto–Owners").

¶ 4 Youngblood purchased the insurance policy, known as underinsured motorist ("UIM") coverage, in the name of his corporation, Youngblood Home Improvement, Inc., rather than in his individual name. He contends that the insurance company's sales agent orally guaranteed him that the UIM coverage being offered from Auto–Owners would also extend to him as an individual pedestrian in the event of an underinsured motorist claim.

¶ 5 Auto–Owners, on the other hand, argues that the policy's language clearly precludes Youngblood from recovering under the UIM provisions and that, therefore, the agent's statements are legally irrelevant. The insurance company relies entirely upon the specific language of the policy. Under the policy language,[1] a person is eligible for UIM coverage in only two circumstances: first, when one sustains bodily injury while *occupying an automobile* that is insured under the UIM policy; or, second, when one sustains bodily injury *as a pedestrian or while occupying another person's automobile* that is not insured under the UIM policy *and*

---

1. The policy states, in pertinent part,
 (a) We will pay compensatory damages any person is legally entitled to recover:
 (1) from the owner or operator of an underinsured automobile;
 (2) for bodily injury sustained while *occupying an automobile that is covered* by SECTION II—LIABILITY Coverage of the policy.
 (b) *If the first named insured in the Declaration is an individual,* this coverage is extended as follows:

 (1) We will pay compensatory damages you are legally entitled to recover:
 (a) from the owner or operator of any underinsured automobile;
 (b) for bodily injury you sustain:
 (1) when you are a *pedestrian;* or
 (2) while *occupying an automobile* you do not own which is covered by SECTION II—LIABILITY Coverage of the policy.
 (emphasis added).

the first named insured in the policy is an *individual.* Also of note, the policy defines "occupying" as "in or on an automobile as a passenger or operator, or being engaged in the immediate acts of entering, boarding or alighting from an automobile." A "pedestrian" is defined as "any natural person who is not occupying an automobile."

¶ 6 There is no factual dispute that Youngblood was a pedestrian and not occupying an automobile, as defined in the policy, at the time he was struck and injured. There is also no factual dispute that Youngblood Home Improvement, Inc., is the first named insured and is not an individual but rather a corporate entity. Under a strict reading of the terms of the policy, then, Youngblood's injury does not qualify for UIM coverage under the Auto–Owners policy. Youngblood concedes that the language of the policy does not extend coverage. However, he advances the principles of estoppel as support for his claim of entitlement.

¶ 7 In his deposition, Youngblood said that an employee of Cottonwood Insurance, acting as Auto–Owner's agent, assured him that he would be covered under the UIM provisions of the policy in the event he was struck and injured while a pedestrian by a motorist who was either underinsured or uninsured. According to Youngblood, the agent repeatedly provided a specific scenario, to wit, "Hey, if you're walking down the street, you've got nothing if you have—if you don't have underinsured and uninsured motorist and somebody runs you over." Throughout his sales interaction with Youngblood, the agent repeated this scenario of getting hit by a car while walking somewhere. The clear implication of the agent's hypothetical was that Youngblood *would not* be covered for injuries sustained as a pedestrian if struck by an underinsured or uninsured driver if he did not purchase the proffered UIM and UM coverage, and that doing so *would* extend protection to Youngblood as a pedestrian if struck by an underinsured (or uninsured) motorist.

¶ 8 After meeting with the agent and agreeing to purchase the UIM coverage, Youngblood received his own copy of the policy in due course. He concedes that he did not read the language of the policy at any point prior to his injury and the rejection of his UIM claim. Instead, he says he relied solely upon the oral representations of coverage made by the sales representative.

¶ 9 Youngblood brought suit against Auto–Owners in the district court when it declined his claim under the UIM provisions. He argued in the district court that even though the explicit terms of the policy do not provide coverage to him under these circumstances, coverage should nevertheless be extended under the doctrine of equitable estoppel. The district court granted summary judgment in favor of Auto–Owners, finding the terms of the insurance policy to be clear and unambiguous in not extending coverage under these circumstances. The district court declined to apply estoppel principles to extend the coverage.

¶ 10 A unanimous panel at the court of appeals reversed the district court's grant of summary judgment.[2] We review the court of appeals' legal conclusion on the sole question of whether or not an insured may apply equitable estoppel to modify the scope of an insurance policy's coverage when the company's agent misstated the scope of coverage prior to the insured's purchase of the policy. We have jurisdiction pursuant to Utah Code sections 78–2–2(3)(a) and (5).

**ANALYSIS**

¶ 11 We review the decision of the court of appeals for correctness.[3] We afford no deference to conclusions of law reached by it, or by the district court.[4]

¶ 12 Acknowledging that the plain language of the insurance policy does not extend protection to him, Youngblood argues that courts should extend coverage as a mat-

**2.** *Youngblood v. Auto–Owners*, 2005 UT App 154, ¶ 27, 111 P.3d 829.

**3.** *Laney v. Fairview City*, 2002 UT 79, ¶ 9, 57 P.3d 1007.

**4.** *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 836 (Utah 1998).

ter of equity under the doctrine of *equitable* estoppel. However, he argues the elements of *promissory* estoppel. Our caselaw recognizes equitable estoppel and promissory estoppel as two distinct legal principles, one a defense and one a cause of action in most instances. However, in insurance coverage cases like this one the technical distinction between equitable and promissory estoppel is of less analytic utility and approaches being irrelevant.

¶ 13 Consequently, we depart from our traditional distinctions between equitable and promissory estoppel in evaluating the applicability of estoppel, as a general concept, to cases of this type. As a result, it may be useful to briefly address the primary distinctions between the two and the basis for our decision to apply more general, "generic" principles of estoppel in this case.

¶ 14 Our caselaw requires proof of three elements for *equitable* estoppel: first, "a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted"; next, "reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act"; and, third, "injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act." [5]

¶ 15 Moreover, "[a]s a general rule, absent circumstances where application of promissory estoppel is appropriate, 'a representation or assurance, in order to furnish the basis of an estoppel, must relate to some present or past fact or state of things, as distinguished from mere promises or statements as to the future.'" [6] We typically only apply equitable estoppel to circumstances involving misrepresentations of past or present fact, along with the other necessary factors. Equitable estoppel reflects circumstances where it is not fair for a party to represent facts to be one way to get the other to agree,

and then change positions later to the other's detriment.

¶ 16 *Promissory* estoppel, on the other hand, contemplates circumstances where a party promises that things will be a given way in the future, knowing at the time of the promise all of the material facts, but is ultimately wrong, and where the other relied on that promise in acting (or withholding action). To make out a case of promissory estoppel necessitates a showing that

(1) [t]he plaintiff acted with prudence and in reasonable reliance on a promise made by the defendant; (2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; (3) the defendant was aware of all material facts; and (4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff.[7]

¶ 17 The distinction we have drawn between these two legal concepts is essentially that in the case of equitable estoppel the representation is made of an existing or previously existing fact, and in promissory estoppel it is of a future fact. In both situations, it is the representor of the incorrect fact who is seeking to avoid responsibility for the error. We have treated equitable estoppel as a defense raised by a party against whom relief is sought when the other party misrepresented facts, and promissory estoppel as a cause of action against the misrepresentor when it fails to perform. Sadly, we have also mixed and muddled this application.

¶ 18 Other courts have recently addressed this traditional distinction. The Tenth Circuit recently observed that promissory estoppel is "an affirmative cause of action or defense, which arises in instances where no formal contract exists and the party seeking promissory estoppel is attempting to prove

---

**5.** *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 34, 989 P.2d 1077.

**6.** *Id.* (quoting 28 Am.Jur.2d Estoppel and Waiver § 46 (2000)).

**7.** *Id.* ¶ 35.

the existence of an enforceable promise or agreement."[8]

¶ 19 Other courts, such as the Ninth Circuit, have also explicitly distinguished between promissory estoppel and equitable estoppel, noting that "promissory estoppel and equitable estoppel are distinct concepts with distinct uses and effects"[9] because "promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have."[10] In other words, "[p]romissory estoppel is a sword, and equitable estoppel is a shield."[11] Legal treatises describe the distinction as follows:

> Promissory estoppel involves a clear and definite promise, while equitable estoppel involves only representations and inducements. The representations at issue in promissory estoppel go to future intent, while equitable estoppel involves statement of past or present fact. It is also said that equitable estoppel lies in tort, while promissory estoppel lies in contract. The major distinction between equitable estoppel and promissory estoppel is that the former is available only as a defense, while promissory estoppel can be used as the basis of a cause of action for damages.[12]

¶ 20 Ultimately, the distinctions make little difference in the matter of insurance coverage disputes between an insured ·who was told he would be covered for certain injuries, and an insurance agent and company denying coverage after the injury has occurred. It is difficult to see any real distinction between an agent representing that a policy will cover a particular peril (a "clear and definite promise"), and an agent representing that the policy provision covers the peril (a "representation" and "inducement" based upon a material and existing fact—the policy provisions existing in the policy to be sold). Under these circumstances, what useful purpose is served by continuing the distinction between the traditional "sword" and "shield"?

¶ 21 We see none.

¶ 22 However, it appears that Youngblood intended to bring a claim under the theory of promissory instead of equitable estoppel. His legal arguments neatly fit those elements described under promissory estoppel. Were we to hold fast to the distinctions between promissory and equitable estoppel, and if we were also to conclude that the agent's misrepresentations or promises were as to future facts, Youngblood would be barred under our prior caselaw from bringing a claim. Such an exalting of form over substance, while not unknown in our caselaw, is to be avoided when possible. Our rules of pleading require that a cause be made out, but not necessarily that it always be correctly labeled. In Youngblood's case, and in others of the same type, the defendant insurance company is denied nothing in terms of knowing what is being claimed and how to defend. We therefore conclude that estoppel, an equitable principle under the court's common law equitable powers, is a sufficient description of such an action.

**8.** *Mile High Indus. v. Cohen*, 222 F.3d 845, 859 (10th Cir.2000).

**9.** *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 918 (9th Cir.2001).

**10.** *Id.; see also Jodek Charitable Trust, R.A. v. Vertical Net, Inc.*, 412 F.Supp.2d 469, 477 (E.D.Pa.2006) ("[T]here is no independent cause of action for 'equitable estoppel' . . .—it may only be asserted as a defense. The only sense in which there is a cause of action for 'equitable estoppel' is insofar as the phrase is sometimes used interchangeably with *promissory* estoppel, a related but distinct concept." (citations omitted)); *Kolkman v. Roth*, 656 N.W.2d 148, 155 n. 3 (Iowa 2003) ("There is a recognized distinction between equitable estoppel and promissory estoppel. . . . Equitable estoppel is used as a shield to estop a party from raising the statute of frauds when plaintiff establishes the defendant 'made a misrepresentation of facts,' as opposed to a promise of a future act, that resulted in detrimental reliance. Thus, it is not an offensive theory that can be used as a basis for damages. On the other hand, promissory estoppel is a broader doctrine that can be utilized as an alternative theory of recovery 'in the absence of a contract' when the plaintiff 'detrimentally relied on a promise,' as opposed to a misstatement of fact." (citations omitted) (quoting David J. Gass, *Michigan's UCC Statute of Frauds and Promissory Estoppel*, 74 Mich. B.J. 524, 525–26 (1995))).

**11.** *Humetrix*, 268 F.3d at 918.

**12.** 28 Am.Jur.2d *Estoppel and Waiver* § 35 (2004).

¶ 23 We are not alone in this approach. Facing this question, some courts either apply the same elements to both, as we now propose to do, or treat promissory estoppel as a subset of equitable estoppel,[13] something we find no less confusing than treating them separately. Overall, however, the difference between equitable and promissory estoppel has become inconsequential particularly in *insurance* cases. We agree with *Corbin on Contracts*, that when a

> party asks an insurance agent if a particular matter is covered by a certain kind of insurance policy[,][and] ... the agent responds: "We've got you covered" or "We cover you for $7,500, and you are fully covered" or similar assurances[,][d]id the insurance agent make a representation of fact or a promise regarding coverage? In reality, it makes little difference so long as estoppel is affirmatively applied to enforce the agent's statement. Thus, whereas earlier decisions applied defensive equitable estoppel, modern decisions, felicitously following the principles of good faith, conscience, and equity underpinning estoppel, apply promissory estoppel as an affirmative cause of action to validate and enforce the agent's promise.[14]

The distinction between equitable and promissory estoppel has become muddled in insurance cases over the decades, and courts have applied either form when choosing to enforce an agent's statement. Therefore, although our prior caselaw may have made a distinction between equitable estoppel and promissory estoppel, we must modify that position. In this case, and in other similar insurance coverage claims, it is unnecessary to decide whether the agent's misrepresentations are to past or to future facts. Consequently, we will apply basic principles of estoppel to these cases.

¶ 24 In this case, Auto–Owners, as the Petitioner and Defendant, would have us interpret Utah law to prohibit any form of estoppel under circumstances where agents misrepresent insurance coverage and the insured reasonably relies on those misrepresentations. Under Auto–Owner's analysis, an insured is responsible to read and understand the contract. They urge that the policy language, if unambiguous, remains unmodifiable by any form of parol evidence.

¶ 25 We disagree, as did the court of appeals. Estoppel may be applied to modify terms of an insurance policy when (1) an agent makes material misrepresentations to the prospective insured as to the scope of coverage or other important policy benefits, (2) the insured acts with prudence and in reasonable reliance on those misrepresentations, and (3) that reliance results in injury to the insured.[15] With this rule of law in mind, we address the consequences to Youngblood and Auto–Owners in this case.

## I. AUTO–OWNERS' AGENT MISREPRESENTED THE POLICY'S SCOPE OF COVERAGE

¶ 26 Our first inquiry is whether the agent's oral statements constituted misrepresentations of the policy's scope of coverage or other benefits. Youngblood argues that the agent made two such misrepresentations: (1) that the policy also covered Youngblood as an individual, even though Youngblood Home Improvement, Inc., was the named insured on the document, and (2) that the policy would cover Youngblood if he were struck by a car while walking down the street.

¶ 27 We agree that these statements are misrepresentations of the policy's coverage. When parsed with great care, the policy terms do not include coverage of Youngblood when struck by a car while a pedestrian. Under provision 2(a), a person may recover from the owner of an underinsured automobile for bodily injuries sustained *while occupying an automobile* covered by the policy.

---

13. *See, e.g., Davis v. Davis,* 855 P.2d 342, 348 (Wyo.1993) ("The doctrines of promissory estoppel and equitable estoppel are closely related and ... they often have been invoked together and interchangeably, without the benefit of clear distinction.").

14. 3 Eric Mills Holmes, *Corbin on Contracts,* § 8.11 (1996).

15. *See, e.g., Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) ("The elements of estoppel are (1) material representation, (2) reliance and (3) damage.").

Youngblood was on foot at the time of the injury.

¶ 28 Youngblood was walking through a medical plaza parking lot when struck and injured. He was not in or on an automobile as a passenger or operator, nor was he entering an automobile at the time. Thus, under the policy, he was not "occupying" an automobile at the time of the accident.

 ¶ 29 Under provision 2(b), when the first named insured in the Declaration is an *individual,* the coverage extends to those bodily injuries sustained as a *pedestrian.* Here, the first named insured on the policy is Youngblood Home Improvement, Inc., a corporate business entity, *not* an individual. This language precludes coverage for Youngblood as a pedestrian because the coverage does not apply if the first named insured (the corporation in this case) is not an individual.

¶ 30 The language of the policy classifies Youngblood as neither a covered "pedestrian" nor "occupying" his automobile at the time of the accident, as required for Youngblood to benefit from the coverage provided by the policy.

¶ 31 Youngblood testified, however, that the agent provided a scenario under which the policy would cover Youngblood under these exact circumstances as a pedestrian. In his deposition, Youngblood testified that the agent said, "Hey, if you're walking down the street, you've got nothing if you have—if you don't have underinsured and uninsured motorist [coverage] and somebody runs you over." Or "[y]ou could be sitting at your desk or walking down the street and if you don't have the coverage, you've got nothing." [16] These statements are in direct conflict with the language of the policy, which does not extend coverage to Youngblood un-

der the given circumstances. Consequently, the agent made misrepresentations about the policy's coverage and other benefits.

## II. DID YOUNGBLOOD REASONABLY RELY ON THE AGENT'S MISREP-RESENTATIONS

 ¶ 32 Having established that an agent made material misrepresentations regarding the policy's coverage, a plaintiff must next demonstrate that he acted prudently and reasonably relied on those misrepresentations.[17] When a party knows or should have known reliance would be in error, the party cannot reasonably rely on the misrepresentation as a matter of law. In this case, the question is whether Youngblood should have known that reliance would be in error.

 ¶ 33 Under our caselaw, " '[a] party claiming an estoppel cannot rely on representations or acts if they are contrary to his knowledge of the truth or if he had the means by which with reasonable diligence he could ascertain the truth.' " [18] Youngblood argues that because we have not previously dealt with this particular fact pattern—an agent making oral misrepresentations upon which an insured relied in purchasing his policy—our estoppel analysis should allow more leniency to the insured in his reliance, given the "nature of insurance agents and insurance contracts." [19] Although we are sympathetic toward those who rely on an agent's misrepresentations, recovery can be permitted only when that reliance is reasonable. To do otherwise would allow too much room for sympathy, passion, and error, and drastically diminish the predictability needed by insureds and insurers in the marketplace.

---

**16.** It appears the agent continued to believe this incorrect representation even after the injury. After the accident, when Youngblood called Cottonwood Insurance to report his claim as a pedestrian, the agent allegedly told him, "Once you get everything out of [the driver of the automobile that struck you], then you have to come to me, but you've got to get everything out of her first and then I can pay your claim."

**17.** *Nunley v. Westates Casing Servs.,* 1999 UT 100, ¶ 36, 989 P.2d 1077 ("A party claiming estoppel must present evidence showing that an

offer or promise was made on which the party based his or her reliance."); *see* Restatement (Second) of Contracts § 90 (1979).

**18.** *Perkins v. Great-West Life Assurance Co.,* 814 P.2d 1125, 1130 (Utah Ct.App.1991) (quoting *Larson v. Wycoff Co.,* 624 P.2d 1151, 1155 (Utah 1981)).

**19.** We presume Youngblood suggests that the "nature" of insurance agents and insurance contracts is not to be seen as good.

¶ 34 On the other hand, the determination of reasonableness is not based "on the subjective state of mind of the person claiming he was misled, but rather is to be based on an objective test, i.e., what would a reasonable person conclude under these circumstances."[20] This reasonable person standard, known for centuries in the law, is the safest way to protect those who would be unduly taken advantage of, be it insured or insurer.

¶ 35 Reliance upon an agent's material misrepresentations regarding coverage may or may not be reasonable, depending upon the facts of the individual case. The policy of the law is not only to protect consumers from fraudulent sales and from agents who misrepresent provisions to make a sale, but also to deter unscrupulous insureds from fabricating agent's statements in order to receive additional coverage or benefits after an injury has occurred.

¶ 36 The law holds insurance agents to accurately representing policy provisions and honestly answering consumer questions. Agents who are not trained to act with complete honesty and integrity in their interactions with consumers, or who simply refuse to do so, place themselves and their principals at risk. The law will hold both principal and agent liable for misrepresentations upon which consumers reasonably rely.

¶ 37 Correspondingly, insurance purchasers fail to make the effort to read and understand the content of their insurance policies at their peril. When the language is clear, direct, understandable to ordinary people, and complete, it will be more difficult to prove reasonable reliance on contrary oral promises. On the other hand, when the language is unintelligible, incomplete, or simply too complex to be understood by persons of reasonable intelligence, reliance on an agent's "plain language" explanations and representations of what the policy covers becomes easier to establish. In addition, the reasonableness of reliance may be affected by the ease, or lack of it, that confronts a person of ordinary intelligence in discovering the whereabouts of otherwise clear, direct,

and understandable terms within an insurance contract. A conclusion that an insurance contract term is unambiguous, while certainly relevant to the issue of whether reliance on a contradictory representation is reasonable, is not the end of the inquiry. A perfectly clear insurance term is of no use if it cannot be located.

¶ 38 In this case, the question of whether or not Youngblood's reliance on the agent's misrepresentations of the scope of coverage under the policy was reasonable is unresolved. It is one of fact. Youngblood may not recover under the doctrine of estoppel if his reliance on the agent's statements was not reasonable. A material question of fact remains to be resolved by the trier of fact, and we therefore remand for proceedings consistent with this opinion.

### CONCLUSION

¶ 39 A party may recover under the doctrine of estoppel when an insurance agent makes material misrepresentations as to the policy provisions, the party reasonably relies on those misrepresentations in buying the coverage, and that reliance results in legal injury to the party. In this case, the agent made material misrepresentations regarding the policy's coverage. Nonetheless, Youngblood has the burden to establish that his reliance was reasonable under the facts of the case.

¶ 40 Affirmed, and remanded for proceedings consistent with this opinion.

¶ 41 Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge HADLEY concur in Associate Chief Justice WILKINS' opinion.

¶ 42 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge SCOTT M. HADLEY sat.

---

**20.** *Larson,* 624 P.2d at 1155.